CLEWS et al. v. JAMIESON et al.

(Circuit Court of Appeals, Seventh Circuit. October 3, 1899.)

No. 533.

CONTRACTS—VALIDITY—SALE OF STOCKS FOR FUTURE DELIVERY.

A contract for the sale and purchase of stocks for future delivery, made on the Chicago Stock Exchange, by the rules of which such contracts can be closed by the payment of the difference between the market and contract price on the day of delivery, is invalid, as an option contract, under the Illinois statute (1 Starr & C. Ann. St. [2d Ed.] pp. 1293–1298), and a court of equity will not entertain a suit based thereon.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The appellants, comprising the firm of Henry Clews & Co., of the city and state of New York, filed their bill in equity, naming as defendants (1) the members of the firm of Jamieson & Co., (2) the managing members of the Chicago Stock Exchange, and (3) the members of the firm of Schwartz, Dupee & Co., all citizens of the state of Illinois. The theory of the bill and the relief prayed for are thus stated in the brief of counsel for appellants: "To have administered and turned over to them $14,000, in the possession of the managers of the Chicago Stock Exchange, claimed by appellants to have been deposited in trust as security for the performance of a contract whereby the appellants agreed to sell and deliver, and the appellees Jamieson & Co. agreed to receive and pay for, on the 31st day of August, 1896, seven hundred shares of Diamond Match Company stock, which contract it is alleged Jamieson & Co. failed and refused to perform;" also, to obtain "an accounting for the loss and damages sustained by the appellants by reason of the breach of contract, and that Jamieson & Co. be decreed to pay to the appellants the amount ascertained." Separate answers were filed by the defendants Jamieson & Co. and Schwartz, Dupee & Co. The remaining defendants demurred to the bill as not stating a cause of action cognizable in equity, but the demurrer was overruled, and such defendants filed separate answers. On the issues thereupon the case was sent to a master, who heard the testimony and reported his findings, which were in favor of the complainants upon all issues, and that on the accounting there was due to them from Jamieson & Co. $64,400. The hearing before the court was upon exceptions to the master's report, and upon certain stipulations of further facts, and resulted in a dismissal of the bill for want of equity. 89 Fed. 63. From the opinion filed, this conclusion appears to have been based on the view that the complainants were not privies to the transaction between Schwartz, Dupee & Co. and Jamieson & Co. This appeal is from the decree of dismissal so entered.

The facts are substantially undisputed. The appellants, Henry Clews & Co., were operators in stocks and bonds at New York City; and Schwartz, Dupee & Co. were like operators or brokers at Chicago, on the Chicago Stock Exchange, as members. Jamieson & Co. were also like operators and members of the Chicago Stock Exchange. The relation of the complainants to any transaction in question appears in communications by wire between them and Schwartz, Dupee & Co., which are stipulated in the case as follows: "On the 16th day of July, 1896, at 11:19 a. m., Schwartz, Dupee & Co. received the following order from H. Clews & Co., by telegram: 'Sell 500 Diamond Match at 220¼ for a/c. [Signed] H. Clews & Co.' On the same day, at 11:35 a. m.,

Schwartz, Dupee & Co. telegraphed Henry Clews & Co. as follows: 'Sold 500 Diamond Match at 221⅛ for the account. [Signed] Schwartz, Dupee & Co.' On the 20th day of July, 1896, at 9:23 a. m., Schwartz, Dupee & Co. received a telegram reading as follows: 'Sell 200 Diamond Match at 221 for the account at opening of market. They want put out at opening if possible, but it is good all day. [Signed] Clews.' On the same day, at 10:08 a. m., Schwartz, Dupee & Co. telegraphed Clews as follows: 'Sold 200 Diamond Match 221½ for the account. [Signed] Schwartz, Dupee & Co.' On the 25th day of July, 1896, at 11:41 a. m., Clews telegraphed Schwartz, Dupee & Co. as follows: 'Change the Diamond Match over to August account at 2½ per cent. If you can do it, let us know at once. [Signed] Clews.' And shortly after that, on the same day, at 11:48 a. m., Clews sent the following dispatch to Schwartz, Dupee & Co.: 'You sent us the difference this morning at 2½. At what difference can you do it now? [Signed] Henry Clews & Co.' On the same day, at 11:58 a. m., Clews telegraphed Schwartz, Dupee & Co. as follows: 'Change the 500 at two cents or better. [Signed] Clews.' On the same day, at 12:11 p. m., Schwartz, Dupee & Co. telegraphed Clews as follows: 'Bought Diamond Match 227 for the account. Sold 500 229 account 2nd. [Signed] Schwartz, Dupee & Co.' On July 27th, at 8:55 a. m., Clews telegraphed Schwartz, Dupee & Co. as follows: 'Change 200 more Diamond Match 2 per cent. or better. [Signed] Clews.' On the same day at 10:53 a. m., Schwartz, Dupee & Co. telegraphed Clews as follows: 'We changed the 200 Match at 2¼ difference. Will give you prices later. [Signed] Schwartz, Dupee & Co.' On the same day, at 10:55 a. m., Schwartz, Dupee & Co. telegraphed Clews as follows: 'Bought 200 Match 226¾ account. Sold 200 2nd account. [Signed] Schwartz, Dupee & Co.' And the stipulation further states "that the orders of Henry Clews & Co. to Schwartz, Dupee & Co., contained in said messages, were, as a matter of fact, executed as set forth in the aforesaid messages from Schwartz, Dupee & Co., on the Chicago Stock Exchange."

The word "account," as used in these telegrams, was understood, in the language of the stock exchange, to mean that the last day of the current month was the "day of delivery" on the proposed sale. The message of July 25th, so interpreted, was understood to mean that 500 shares of the stock previously sold for "account" should be carried over to August account, or "account second," for which accommodation the seller allowed 2 cents on the dollar, making $2.29 per share. The final direction on July 27th was to place 200 more shares on the same terms for August account, making their offers on that account 700 shares, with all previous offers canceled. By the rules of the stock exchange, each broker, as a member, was required to keep on deposit with the managers of the exchange, as a trust fund to secure performance, an amount equal to 10 per cent., par value, of the stocks bought or sold. and this deposit is readjusted at the close of each day's session. Under this rule. Schwartz. Dupee & Co. claim to have kept their deposits good; and this deposit, together with that made by the buyer, constitute the alleged trust funds referred to in the bill, for which administration is sought.

The method of conducting business in the stock exchange between the brokers is thus fairly stated in the master's report, and in the opinion filed by the trial court: "At ten o'clock there is an official call, at which the secretary and manager call all the stocks, bonds, and securities on the official printed list; and, as this call progresses, any member wishing to buy or sell bids thereon, and the record is made of the transaction, after which there is an irregular call, which closes at half past one, when the manager of the clearing house announces the clearing-house or settlement price for the day, which are the closing prices on the exchange for the respective stocks and securities. That the manager then substitutes trades, and sends out cards to all buying or selling on account for the current month or for the next month. That on the 25th of the month, and thereafter until the second day before the end of the month, two calls are made,—one for the current month and one for the next ensuing month,—and this is done to allow those who wish to do so to change their accounts over to the next month. That this substitution was made by the clearing department by a system somewhat similar to that employed by the clearing house for banks; that is, that, where a broker has purchased and sold during the day the same amount

of the same kind of stocks or bonds, his account is balanced by the clearing department, and all margins deposited by such broker may be withdrawn; that when sales and purchases are made by different brokers, one buying and the other selling the same kind of stock or bonds, a substitution is made by the manager of the clearing department, by which it appears that the broker selling has sold such stock, not to the person to whom it was originally sold, but to a person or persons other than those to whom such sales were originally made, and who originally bought of some one else, and that a broker purchasing stock has purchased from some broker other than the broker from whom he originally purchased the same. For instance, if A. sold 100 shares of stock to X., and B. has bought the same amount of the same stock from Y., and X. and Y.'s accounts are balanced by other transactions, the substitution would make it appear that A. had sold 100 shares to B., and B. had bought 100 shares from A., and the names of the parties with whom the original transactions had actually been made by A. and B. would not appear on the clearing-house sheet. That in the transaction on said exchange it is then customary for the parties thus substituted and brought into the relation of buyer and seller with each other by the manager to assent to the new relations thus formed, and to confirm the transactions as thus adjusted by the manager, and to put up the margins required by the rules, unless the margins are already on deposit in the exchange, in which case they are transferred by the manager to the new account."

The stipulation of facts further shows all dealings of both Schwartz, Dupee & Co. and Jamieson & Co. which appeared upon the clearing-house sheets of the exchange for all dates in question; and although the former had original and substituted trades in Diamond Match stock with sundry other brokers prior to August 3, 1896, no trade appears with Jamieson & Co. up to that date, except to the extent of 100 shares. On August 3d, Jamieson & Co. appear as taking by "substitution" from Schwartz, Dupee & Co. 1,150 shares of such stock at $2.22. Of this transaction it is asserted on behalf of complainants that 700 shares were "substitution trades" for the complainants' orders of July 25th and July 27th, although at lower price than named in the order, and that Jamieson & Co. thereby became the "ultimate purchaser" of such shares, in accordance with the rules of the exchange, and that "it is seldom the original purchaser who is ultimately made responsible, but by a process of daily novations the original purchaser and many subsequent purchasers liquidate their contracts and are discharged from liability thereon before the 'account day,' some other member of the exchange assuming the new obligation."

The stipulation in reference to the trades by Schwartz, Dupee & Co. further states as follows: "That the 500 shares sold July 25, 1896, by Schwartz, Dupee & Co. for the 'August account' were sold for the account of Clews & Co., the complainants. That 200 shares of the 350 shares sold July 27, 1896, by Schwartz, Dupee & Co. for the 'August account' were also sold on account of complainants. That all of the other sales made by Schwartz, Dupee & Co. for the 'August account' were made on behalf of other clients than the complainants. That the 750 shares sold by Schwartz, Dupee & Co. on July 28, 1896, were sold for four different clients of Schwartz, Dupee & Company,—for one to the amount of 50 shares, for another to the amount of 300 shares, for another to the amount of 350 shares, and for another to the amount of 50 shares. The client for whom Schwartz, Dupee & Co. bought the 350 shares on July 27th is the same person for whom they sold 350 shares on July 28th, and who sold in order to close his purchase of July 27th. That the client for whom Schwartz, Dupee & Co. sold 300 shares on July 28th is the same person for whom Schwartz, Dupee & Company bought 300 shares on July 29th, and said purchase of July 29th was made to cover said person's sale of July 28th. That the transactions heretofore set out in this stipulation of purchase and sale of Schwartz, Dupee & Co. and the other brokers whose names are stated, with the exception of those transactions which are marked as substitutions, were had by the brokers on behalf of different clients or principals whom they represented, and those transactions, so far as the different principals are concerned, were not settled or canceled by any of the substitutions, nor by any of the settlements between the brokers, except so far as

where one client or principal of a broker was, through such broker, both a purchaser and a seller. In other words, the settlements by substitution or otherwise through the clearing house were merely settlements between the members of the stock exchange, and were not settlements or cancellations of the contracts between the principals whom the bankers represented and the brokers themselves, except where the same broker had both purchased and sold for the same client."

On August 3, 1896, the Chicago Stock Exchange was closed by order of the managers, and remained closed until November 5, 1896, so that there was no opportunity for further transactions on the exchange in reference to the subject-matter of this controversy after August 3d. On August 31, 1896, Schwartz, Dupee & Co. made personal tender to Jamieson & Co. of 1,150 shares of Diamond Match stock, and the latter refused to accept or pay for the same.

The following stipulation further appears: "It is admitted by the complainants that at the time complainants gave the several orders to Schwartz, Dupee & Co. to sell on the Chicago Stock Exchange the various amounts of Diamond Match Company stock, and at the time said Schwartz, Dupee & Co. executed said orders, said Schwartz, Dupee & Co. did not have in their hands any stock of said Diamond Match Company which was the property of the complainants, nor did said Schwartz, Dupee & Co. at any time thereafter have in their hands any of said stock of said Diamond Match Company which was the property of the complainants. It is admitted by the complainants that the 1,150 shares of the capital stock of the Diamond Match Company tendered to Jamieson & Company by Schwartz, Dupee & Co. on August 31, 1896, were not the property of the complainants, nor any part thereof."

No communication with, or appearance on the part of, Henry Clews & Co., is shown in reference to the transactions after July 27th and up to September 10th and 11th, and any claim of their participation therein was unknown to Jamieson & Co. prior to the latter date. On September 11th Schwartz, Dupee & Co. delivered to Jamieson & Co. a letter of the former, dated September 9, 1896, referring to their tender of the 700 shares, and stating that the sale was made by them as agents for Henry Clews & Co., "who may rightfully take any steps to enforce the contracts" or make settlement, and also a letter of Henry Clews & Co., by their attorneys, dated September 10, 1896, claiming such interest in the transaction, and notifying that sale of the 700 shares would be made to the highest bidder at the rooms of the Chicago Real-Estate Board on September 15, 1896, etc. On September 22d and 23d notices were given, respectively, that the sale had been adjourned to, and was made on, September 22. On September 22, 1896, Schwartz, Dupee & Co. made pretended sale of 700 shares of the stock (being the same transaction set up in the bill), by way of fixing the price for measuring damages, of which the following stipulation of facts is made: "It is further admitted: That the 700 shares of said stock alleged in the bill of complaint to have been sold on the 22d day of September, 1896, were not delivered to Frank N. Gage, but immediately after said shares of stock were delivered to Major J. W. Conley, one of the firm of Schwartz, Dupee & Co., by H. J. Davis, who conducted said sale on behalf of Henry Clews & Co., for safe-keeping by said J. W. Conley. That afterwards and on the same day said H. J. Davis delivered to said Frank N. Gage a memorandum in words as follows: 'September 22, 1896. Sold to Frank N. Gage 700 shares of Diamond Match stock, numbered A680-686, inclusive, at $130 per share. Henry Clews & Co., per Estabrook & Davis.' That thereupon said Gage wrote below said memorandum the following: 'Chicago, September 22, 1896. O. K. Please deliver to I. H. Waggoner, Esq., and accept his check in settlement. Frank M. Gage.' And thereupon said Gage re-delivered said memorandum and said order to said H. J. Davis, who thereupon delivered the same to Mr. I. H. Waggoner, together with an order on Schwartz, Dupee & Co. to deliver said certificates of shares to said Waggoner upon being paid the amount of $130 per share. That said Gage was employed by said Waggoner to bid at said sale, and that said Waggoner was acting for and on behalf of the complainants in this suit, in the employment of said Gage. Complainants object to the foregoing admission being considered as evidence; for, while admitting that these are the facts, at the same time they claim they are immaterial to the issues in this case, and object on the ground

of immateriality." The pretended sale was so made, for the reason that the exchange was then closed, pursuant to the rules, by order of the managers, notwithstanding a rule of the exchange which reads as follows: "Should any member neglect to fulfill his contract on the day it becomes due, the party or parties contracting with him shall, after giving notice as required by section 2 of the preceding article, employ an officer of the board to close the same forthwith in the exchange by purchase or sale, as the case may require, unless the price of settlement has been agreed upon by the contracting parties. In case of a failure of a creditor to close the contract as above, the price shall be fixed by the price current at the time such contract ought to have been closed under the rule. In all cases where an officer may be directed to buy or sell securities under this rule, the name of the member defaulting, as well as that of the member giving the order, shall be announced. No order for the purchase or sale of securities under this rule shall be executed unless made out in writing over the signature of the party giving the order, who shall state the reason therefor; and it shall be the duty of the officer who executes the order to indorse thereon the name of the purchaser or seller, the price and the hour at which the contract is closed, and hand the same to the secretary of the board, who shall within twenty-four hours ascertain whether the party for whose account the order was given has paid the difference, if any, arising from the transaction. If not, the secretary shall report the default to the president. The duty devolved upon the officers of the exchange under this rule shall be performed without charge. No party shall be permitted to supply offers to buy or sell securities closed for his account under the rule; and, when a contract is closed under this rule, any action of the defaulter, direct or indirect, by which the prompt fulfillment of such contract is delayed, hindered, or evaded, to the detriment of the other contracting party, shall subject the offending party to suspension for not less than thirty days, in the discretion of the governing committee, by a vote of two-thirds of the members present at the meeting. When contracts are closed out under the rule, any member supplying the bid or offer, and not duly receiving or delivering the stock, as the case may be, renders himself liable to prosecution under this article. Should any stock thus sold not be delivered until the next day, the contract shall continue, but the defaulting party shall not be liable to pay such damage as may be assessed by the arbitration committee. The same rules as to notice, time, and places that govern defaults in other contracts shall apply to borrowed securities, which, on nondelivery or receipt, must be borrowed or loaned in open market, except in case of actual default in receiving or delivering after notice to close the loan. Then the same are to be bought or sold as the case may be, for the account of the defaulter, in the manner provided in this article."

H. D. Estabrook, for appellants.

Samuel P. McConnell, for appellees.

Before WOODS and JENKINS, Circuit Judges, and SEAMAN, District Judge.

SEAMAN, District Judge, after the foregoing statement, delivered the opinion of the court.

Except for the fund or deposit alleged to constitute security for performance of the contract in question, a remedy for a breach rests at law, and equitable jurisdiction depends upon the existence of such fund to be administered or charged. And to maintain the bill it is further indispensable for the complainants to establish: First, an executory contract of purchase by Jamieson & Co., bona fide and enforceable in equity, secured by such fund; second, privity of the complainants in the contract and fund; and, third, actual injury either suffered or impending through the alleged breach. Failing proof or admission of these requisites, or either of them, the bill is properly dismissed for want of equity.

From the opinion filed in the trial court, it appears that dismissal was based on a finding of want of privity in the alleged contract; and the arguments at the bar and in the briefs of counsel upon both sides are mainly directed to that question in its various phases, as presented by the peculiarities of the transactions. Other contentions relate to the measure of damages,—whether the rules of the exchange adopted by the parties furnish an exclusive method or measure to determine the amount of damages for a breach, and whether, in any view, the pretended sale offered on behalf of the complainants can be recognized. Underlying these contentions, however, on the undisputed testimony, this paramount question obtrudes itself: Is a valid contract shown, or one which equity will enforce even between proper parties? The importance of the inquiry thus arising is recognized as one affecting a branch of operations which appears to have countenance and extended practice in the commercial world, however infrequently its transactions are brought into courts of equity for adjustment. But it cannot be ignored when the purported contract is presented as the foundation for relief in equity, and neither silence nor acquiescence on the part of the litigants will excuse the court from its determination. Otherwise stated, the question for solution is whether the contract in proof was one of bona fide purchase and sale of stock, or was either a mere wagering transaction or a contract in options. In Irwin v. Williar, 110 U. S. 499, 508, 4 Sup. Ct. 165, the general rule governing such transactions is thus declared:

"The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer, and, if under guise of such a contract, the real intent be merely to speculate in the rise and fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void."

In Embrey v. Jemison, 131 U. S. 336, 344, 9 Sup. Ct. 776, and in Bibb v. Allen, 149 U. S. 481, 492, 13 Sup. Ct. 950, this doctrine is reaffirmed, and in the latter case is well distinguished, as showing by the undisputed testimony that actual delivery was not only intended by both parties, but was expressly required by the rules of the Cotton Exchange governing the transactions.

Aside from the general rule, the contract in question is further subject to such statutory provisions of the state of Illinois as may be found applicable, and sections 130 and 131 of the Criminal Code of that state (1 Starr & C. Ann. St. [2d Ed.] pp. 1293, 1298) read as follows:

"Sec. 130. Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any such commodities, shall be fined not less than $10 nor more than $1,000 or confined in the county jail not

exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void.

"Sec. 131. All promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages, or other securities or conveyances made, given, granted, drawn or entered into, or executed by any person whatsoever, where the whole or any part of the consideration thereof, shall be for any money, property or other valuable thing, won by any gaming or playing at cards, dice, or other game or games, or by betting on the side or hands of any person gaming, or by wager or bet upon any race, fight, pastime, sport, lot, chance, casualty, election or unknown or contingent event whatever, or for the reimbursing or paying any money or property knowingly lent or advanced at the time or place of such play or bet, to any person or persons so gaming or betting, or that shall, during such play or betting, so play or bet, shall be null and void and of no effect."

These provisions were under consideration in Pearce v. Rice, 142 U. S. 28, 40, 12 Sup. Ct. 130, and were held to invalidate a contract which arose out of grain deals on the Chicago Board of Trade. Rulings by the supreme court of Illinois in Tenney v. Foote, 95 Ill. 99; Lyon v. Culbertson, 83 Ill. 33, and Pickering v. Cease, 79 Ill. 328, are there cited and applied; and the later cases of Pearce v. Foot, 113 Ill. 228, Cothran v. Ellis, 125 Ill. 496, 16 N. E. 646, Schneider v. Turner, 130 Ill. 28, 22 N. E. 497, and Soby v. People, 134 Ill. 66, 25 N. E. 109, reaffirm such rulings, and clearly hold that contracts which purport on their face to be absolute for sale or purchase are within the prohibition of the statute, "if the real intention of both parties at the time of making the contract was to deal only in options, and make future settlement upon the basis of the difference in the market price, without the actual delivery of the grain or other commodity sold or purchased." Soby v. People, supra.

Wherever the general doctrine against wagering transactions stands alone as the test of validity, it is well settled in actions at law that a contract of purported purchase and sale will stand upon the presumption which arises in its favor, that actual delivery was intended, unless the proof clearly overcomes the presumption and establishes a mutual understanding by the parties that the transaction was a mere speculation in the market price, to be performed only by paying or receiving the amount of rise or fall in the market on the day named for delivery. In the case at bar there is no substantial conflict in the testimony, and on its face the correspondence between the complainants and their brokers speaks of "sales of Diamond Match stock for July account," of inquiries for the "difference" demanded to change to August account, and of changes then ordered and reported as made by allowing the "difference." It is not stated in terms by either party that delivery was not intended, nor does it appear in express terms in the correspondence or testimony that there was to be no actual delivery of the stock referred to on the purported sale. On the other hand, there is neither averment nor pretense that the sellers had or controlled any shares of the stock, or procured or intended to procure the same for delivery; and it is conceded that they had no stock at any time in the hands of their brokers, and no property in the stock of which pretended tender and sale was made after the alleged default. As the rules of the stock exchange made distinct provision for "closing contracts" so entered

into by paying "the difference" in market price, and the operations were conducted under such rules, by parties who were unquestionably acquainted with them, there is surely strong ground to infer an understanding by the parties that such was the contract, and not one of actual sale and delivery, or, as well described in Pearce v. Rice, 112 U. S. 28, 40, 12 Sup. Ct. 135, that they were "merely to speculate upon the rise and fall in prices, with an explicit understanding from the outset that the property apparently contracted for was not to be delivered, and that the transactions were to be closed only by the payment of the difference between the contract price and the market price at the time fixed for the execution of the contract."

In discussing the authority conferred upon the broker by the complainants, the brief of counsel presented on their behalf contains an interpretation of their contract which clearly discloses their understanding of the matter as above indicated, in the following para phrase of the terms of these instructions:

"Please sell to whomsoever you think responsible seven hundred shares of Diamond Match stock at $229 per share, to be delivered August 31st. If the person to whom you sell should become dissatisfied with his bargain, and you can find some one to take it off his hands at a lower price, you are authorized to cancel the original contract and accept the substituted purchaser in the stead of the first purchaser, provided you are paid the difference in money. The money, of course, you will hold to our use. If the second purchaser, in turn, should wish to withdraw, and you or he can find some one willing to take the shares at a still lower price, you are authorized to cancel the existing contract, as before, and in like manner to accept the third purchaser, provided you are paid the difference in cash. And this you may do on like terms whenever and as often as you see fit. On the other hand, if the price advances it may be expedient and convenient that we should, if possible, cancel the existing contract (with whomsoever it may be), and obtain a new contract at the current price, in which event you are authorized to pay and charge to our account whatever it costs to obtain such a novation, and this also you are authorized to do whenever and as often as you may deem expedient; for we have carefully studied this matter, and we take it that, by the process indicated, we will be in or out on the day of delivery precisely the difference between our original offer and the then market price."

In equity jurisprudence it is fundamental that "equity looks to the intent rather than to the form," and "will never suffer the mere appearance and external form to conceal the true purpose, objects, and consequences of a transaction"; that one who seeks relief must come open-handed, with clean hands, and, to obtain relief, must clearly show that equity and good conscience are with him. In this view it is at least questionable whether relief can be claimed on the mere form of this contract, resting alone on its presumptive force at common law, without "probing the conscience" of the party for the true object. We are of opinion, however, that the transaction as disclosed clearly falls within the terms of the Illinois statute above cited, as interpreted by decisions of the supreme court of the state, and that neither the inquiry last suggested, nor the sufficiency of the proof to show a wagering contract under the common-law rule, requires decision to ascertain the invalidity of the contract thus disclosed.

In Schneider v. Turner, 130 Ill. 28, 22 N. E. 497, these provisions are held applicable to a contract relating to the sale of shares of

railway stock, and the proposition is refuted that the act merely invalidates gambling contracts, or such "option contracts as contemplate a settlement by differences." It is remarked in the opinion:

"If that construction is the true one, why was the statute enacted at all? Nothing is more clearly and firmly established by the common law than that all gambling contracts are void. It is equally well settled that all contracts for the purchase and sale of property, with the understanding or agreement of the parties—whether that agreement is expressed on the face of the contract or exists by secret understanding—that the property is not to be delivered or accepted, but the contract satisfied by an adjustment of the differences between the contract and market price, are mere wagers or gambling contracts, and void."

It is then said that the act intends more than the condemnation of contracts "which were already gambling contracts and void"; that its manifest object—

"Is to break down the pernicious practice of gambling on the market price of grain and other commodities. How is this object sought to be accomplished? There was or is nothing illegal or even immoral in an option contract, within itself. The evil aimed at nevertheless grew out of such contracts. As said by Judge McAllister in the opinion referred to in Tenney v. Foote, 'In practice on the stock exchange it was often the intention of the parties that no stock should be delivered, but the transaction settled upon differences;' and by Judge Andrews, in the Bigelow Case, 70 N. Y. 202, 'Contracts of this kind may be mere disguises for gambling.' In this case the parties might have intended, if appellants called for the stock, to settle on differences. The contract could have been made the disguise for gambling on the future price of stock of the North Chicago City Railway. The question is not, did they so intend? but, did not the legislature regard such contracts as lying at the root of the evil aimed at, and strike at them? The treatment is heroic, but the evil was most malignant. * * * The contract, tested by the statute, is void."

In the earlier case of Pickering v. Cease, 79 Ill. 328, this view is exemplified as follows:

"Agreements for the future delivery of grain or any other commodity are not prohibited by the common law, nor by any statute of this state, nor by any policy adopted for the protection of the public. What the law does prohibit, and what is deemed detrimental to the general welfare, is speculating in differences in market values. The alleged contracts for August and September come within this definition. No grain was ever bought and paid for, nor do we think it was ever expected any would be called for, nor that any would have been delivered had demand been made. What were these but 'optional contracts,' in the most objectionable sense; that is, the seller had the privilege of delivering or not delivering, and the buyer the privilege of calling or not calling for, the grain, just as they chose. On the maturity of the contracts, they were to be filled by adjusting the differences in the market values. Being in the nature of gambling transactions, the law will tolerate no such contracts."

So in Pearce v. Foot, 113 Ill. 228, 239, it is said: ·

"Although the statutes being considered are highly penal, there is no warrant for construing them with any unreasonable strictness. They ought rather to have a just, if not liberal, construction, to the end the legislative intention may be accomplished,—to prohibit all dealings in options in grains or other commodities. Nothing is productive of more mischievous results. Considerable fortunes secured by a life of honest industry have been lost in a single venture in 'options.' The evil is all the more dangerous from the fact it seemingly has the sanction of honorable commercial usage in its support. It is a vice that has in recent years grown to enormous proportions. Legitimate

transactions on the board of trade are of the utmost importance in commerce. Such contracts, whether for immediate or future delivery, are valid in law, and receive its sanction and all the support that can be given to them. It is only against unlawful 'gambling contracts' the penalties of the law are denounced, and no subtle finesse of construction ought to be adopted to defeat the end it is to be hoped may be ultimately accomplished."

However the terms "option" and "optional contracts" may be used and defined elsewhere, the construction of this statute by the supreme court of the state is controlling here, and invalidates the contract upon which the bill of complaint is founded. Such was the ruling in Lester v. Buel, 49 Ohio St. 240, 30 N. E. 821, where transactions were involved of like character on the Chicago Board of Trade, and were held to be within the provisions of the Illinois statute, and prohibited as well by a statute of Ohio of like import. We are of opinion that the bill was properly dismissed for want of equity, and the decree is affirmed.