## Board of Trade et al. v. Central Stock and Grain Exchange.

1. BUCKET-SHOPS—*Object of the Act Prohibiting.*—The act to suppress bucket-shops and gambling in stocks, bonds, petroleum, cotton, grain, provisions and other produce (laws. 1887, p. 96) is directed against the keeping of any office or place wherein is conducted or permitted the pretended buying or selling of grain or other produce, on margins or otherwise, without any intention of receiving the property bought, or of delivering it, if sold.

2. SAME—*Keepers Of, as Witnesses.*—The keeper of a bucket-shop can not shield himself from criminal responsibility behind the fact that he made no inquiry of his customers as to their intentions. He must know that the transaction is not gambling or, in good faith, have just reason to believe that the buying and selling is not within the intended prohibition of the statute.

3. SAME—*Sufficiency of the Proof.*—Where the proof establishes beyond question that purchases are made without any intention of receiving the commodity purchased and that the only object is to make money on the fluctuations of the market by the pretended purchase of grain on margins, such proof is sufficient to establish the existence of a bucket-shop within the meaning of the statute.

4. GAMBLING—*Speculation in Futures, Unlawful in this State.*—It is no longer lawful in this State, under any shift or device, however specious, to keep an office or other place where parties may under the pretense of buying or selling grain or other produce, engage in speculation in futures and gamble upon the rise and fall of the market.

5. PRESUMPTIONS—*Where a Party Refuses to Testify*—When a party refuses to answer relevant questions or to produce evidence in his possession, or subject to his control, the presumption is that the testimony, if given, or the evidence. if produced, will be unfavorable to him.

6. INJUNCTIONS—*Restraining the Board of Trade from Prohibiting Persons from Becoming Members.*—It is error to enjoin the enforcement of a rule of the Board of Trade which does not infringe public policy or any rule of law and is not in itself unreasonable.

**Bill for an Injunction.**—Appeal from the Circuit Court of Cook County; the Hon. EDWARD P. VAIL, Judge, presiding. Heard in this court at the March term, 1901. Reversed. Opinion filed November 21, 1901.

**Statement.**—July 28, 1901, appellee filed a bill against the Board of Trade of the City of Chicago and the Western Union Telegraph Company, alleging that appellee is an

Illinois corporation and is engaged in the business of dealing in grain, provisions, product and other commodities in the city of Chicago; that the Western Union Telegraph Company, which, by arrangement with the Board of Trade, transmitted to third persons the market quotations of the board, had, by request of appellee, so strung its wires as to connect them with appellee's place of business in the city of Chicago, and there attached them to instruments placed there by said telegraph company; and, by means thereof, communicated with appellee and delivered to it said market quotations; that said market quotations are affected with a public interest, and that the successful management of appellee's business depends entirely upon receiving instantaneously the said market reports. The bill avers that the Board of Trade has threatened to prevent the market reports from being transmitted to appellee, and to withhold from the telegraph company information as to the market quotations, and to prevent the transmission to appellee of said quotations. The bill charges that it is the intention of the telegraph company, at the instigation of the Board of Trade, to cut off and disconnect its wires communicating with appellee's place of business, and to remove therefrom the instruments and means of obtaining the market quotations. The bill also avers that the board has forbidden its own members to deal with certain members of the public, who are in receipt of certain market information, and who are engaged in the same kind of business as that conducted by members of the board on the floor of its exchange, but in competition with said members, under a penalty of disciplining any of its members who shall violate such regulation, etc.

On the filing of the bill an injunction was issued, as prayed in the bill, enjoining the Western Union Telegraph Company and the Board of Trade of the city of Chicago from cutting off or disconnecting the telegraph wires from the line or lines of wires or circuits over which the market information of the Board of Trade has been and is being transmitted to the Central Stock and Grain Exchange at its

place of business in Chicago, and from removing therefrom the instruments and appliances used in connection with said wires, and enjoining the Board of Trade from doing anything to prevent the Western Union Telegraph Company from gathering such information and market news of transactions on the board and furnishing them to complainant, and from making any contract with any person that will prevent the Western Union Telegraph Company or complainant from receiving said quotations as promptly as any other person, and from doing any act discriminating against complainant respecting the said quotations, and from interfering with or prohibiting any person, firm or corporation being a member of the Board of Trade, from doing business with the complainant the same as they do with other persons.

The Western Union Telegraph Company entered an appearance, but filed no answer. July 21, 1900, the board of trade answered, averring, among other things, that appellee is engaged in conducting a bucket-shop, in which it makes with its customers certain pretended contracts respecting the purchase and sale for future delivery of grain and provisions, wherein the parties and the complainant only contemplate that such contracts or trades shall be settled according to the public market quotations of this defendant, without any *bona fide* transaction or contract for actual delivery, and that said pretended contract or trades are, in reality, but bets upon market prices, and that said market quotations are necessary to enable appellee to conduct said business. The answer further avers that by reason of the giving of the market quotations to bucket-shops by the telegraph companies, it adopted June 25, 1900, certain regulations concerning the distribution of the quotations, which were put in the form of a contract, which contract was submitted to the telegraph companies, including the Western Union company, with a notice that, in order to receive the quotations, they must sign the same before August 1st; that the Western Union company declined to sign said contract, but the Cleveland Telegraph

Company signed it.   Attached to the answer, and made a part thereof, is the contract referred to between the board and the Cleveland Telegraph Company.   The contract provides that the board will furnish the market quotations to the telegraph company, and the company agrees as follows:

" Said telegraph company agrees that it will not knowingly furnish or sell, directly or indirectly, said quotations or other news to any person, firm or corporation conducting a bucket-shop or other similar place where such quotations are used as a basis for bets, or other illegal contracts, based upon the fluctuations of the price of commodities dealt in on said board of trade; nor will it knowingly continue to furnish such quotations to any person, firm or corporation, who shall re-transmit or furnish the same to any person, firm or corporation conducting such bucket-shop or other place, but said telegraph company shall be liable for costs in suits brought to enforce this clause only when it shall actively defend such suit.   Said telegraph company agrees that it will not, directly or indirectly, furnish said quotations to any other telegraph company or other person, firm or corporation engaged in the business of distributing market news by telegraph or telephone, the intent hereof being that every such telegraph company or other disseminator of news shall come into direct contract relation with, and accountability to, said board of trade as a condition to its being furnished said quotations and news."

It is also averred in the answer that the board has established the following rule for the government of its members:

Section 8.   " Any member of the association who shall be interested or associated in business with, or who shall act as the representative of, or who shall knowingly execute any order or orders for the account of any organization, firm or individual engaged in the business of dealing in differences on the fluctuations in the market price of any commodity—without a *bona fide* purchase and sale of property for an actual delivery—shall be deemed guilty of unmercantile conduct, which renders him unworthy to be a member of the association; and, upon complaint to and conviction thereof by the board of directors, he shall be expelled from membership in the association."

August 4, 1900, appellee filed a supplemental bill, averring that while a motion for a dissolution of the injunc-

tion was pending, counsel for the Board of Trade offered, in open court, to permit appellee to receive the quotations through the Cleveland Telegraph Co., and that thereupon an order was entered giving appellee leave to file a supplemental bill and permitting the Western Union Co. to discontinue the furnishing of quotations, and the board of trade to furnish them to the Cleveland Telegraph Co., and the latter company to furnish them to appellee; that, since the making of said order, the Cleveland Telegraph Co. is performing the same service for appellee which was formerly performed for it by the Western Union Co., and that all the allegations of the original bill as to the Western Union Co. are true as to the Cleveland Co. Prayer that appellee may have the same relief against the latter company as prayed in the original bill against the former company.

The Board of Trade answered, denying that it assented to any arrangement by which appellee was to receive the quotations from the Cleveland Co., and averring that since July 31, 1900, appellee has been receiving the quotations from that company in accordance with a contract between it and the company, set up in the answer of the company.

The Cleveland company answered, setting out the contract of July, 1900, between it and the Board of Trade heretofore referred to, and also setting out a contract between it and appellee for the furnishing by it to appellee of the market quotations of the Board of Trade, which contract contains the following undertaking of appellee :

" That said party of the second part agrees that its business is and shall be the business of a dealer in grain, produce, stocks, bonds and other commodities; that said party of the second part is not conducting, and will not conduct, a bucket-shop, or other business contrary to the criminal laws of the State of Illinois, or use or allow any one else to use said quotations for that purpose."

It is also provided by the contract that (except in a case not here involved) neither party shall terminate the contract without giving to the other party thirty days' written notice of its intention so to do. The cause was heard before the chancellor on the testimony of witnesses and

other evidence given and produced in open court. The court found, among other things, that the defendants have not, nor has any of them, any right to discriminate between persons and corporations engaged in business, and who are ready to pay for the market quotations, and to conform to all reasonable regulations as to the collection and transmission thereof. The temporary injunction is made perpetual by the decree and the relief prayed is granted.

HENRY S. ROBBINS, attorney for appellants.

KERN, FULLEN & BROWN, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

The sole defense set up in the answers is, that appellee is engaged in conducting a bucket-shop; in other words, that the appellee's business is such as is prohibited by " An act to suppress bucket-shops and gambling in stocks, bonds, petroleum, cotton, grain, provisions and other produce," in force July 1, 1887. 1 S. & C. Rev. Stat. 1896, p. 1304 (laws 1887, 96). Section 1 of the act provides :

" That it shall be unlawful for any corporation, association, copartnership or person, to keep or cause to be kept within this State any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum, cotton, grain, provisions or other produce, either on margins or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold; or wherein is conducted or permitted the pretended buying or selling of such property or margins; or when the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold; and the keeping of all such places is hereby prohibited," etc.

Section 2 of the act is as follows :

" It shall not be necessary, in order to commit the offense defined in section 1 of this act, that both the buyer and the seller shall agree to do any of the acts therein prohibited, but the said person thus pretending or offering to sell, or

thus pretending or offering to buy, whether the offer to sell or buy is accepted or not, and any corporation, association, copartnership or person who shall communicate, receive, exhibit or display, in any manner, any such offer to so buy or sell, or any statements or quotations of the prices of any such property, with a view to any such transaction as aforesaid, shall be deemed an accessory, and, upon conviction thereof, shall be fined and punished the same as the principal and as provided in section 1 of this act."

The Supreme Court, in Soby v. The People, 134 Ill. 66, has, in a very careful opinion, stated the object of the act, and what would be violation of it. The court say:

" It is manifest that the object of the statute was to suppress and prevent gambling in grain and other commodities." Ib. 71. Also:

" A consideration of the act will, as before indicated, show that it is directed against the keeping of any office or place, etc., first, wherein is conducted or permitted the pretended buying or selling of grain or other produce, on margins or otherwise, without any intention of receiving the property bought or delivering it if sold. Under this clause of the first section, the offense consists in keeping the place, etc., where such buying or selling is conducted or permitted. That plaintiff in error kept the office or place is conceded, and that buying and selling upon margins, without any intention on the part of the customer to receive the thing bought or to deliver the thing sold, was permitted in such office or place so kept by the plaintiff in error is also substantially conceded, and if it were not, is abundantly proved. Under this provision of the act, the keeper of such office or place, etc., can not shield himself from criminal responsibility behind the fact that he made no inquiry of his customers. The statute is preventive in its character, and is aimed at the keeping of places where gambling in grain is permitted. The keeper must know that the transaction is not gambling, or, in good faith, have just reason to believe that the buying or selling is not within the intended prohibition of the statute. But if this were not so, there is abundant evidence in this record to show that the plaintiff in error knew that his customers did not contemplate an actual delivery of the commodity bought or sold. Again, the second clause makes it an offense to keep a place, etc., wherein is conducted or permitted the pretended buying or

selling of such produce on margins. It is scarcely contended that the customer did not, in fact, intend only to purchase options, and to make money in the rise and fall of the market, without any expectation of receiving or delivering grain. In other words, it is too plain for argument, that the buying and selling of grain was a mere pretense, at least so far as the customer was concerned. Again, the third clause creates the offense where the party buying such produce, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold. Here the proof establishes, beyond question, that purchases were made without any intention of receiving the commodity purchased. The only object was to make money on the fluctuations of the market by the pretended purchase of the grain on margins."

The evidence in the case is very voluminous. The evidence for the appellants, on whom the court held the burden of proof rested, was mainly directed to proving that the appellee kept a bucket-shop within the meaning of the statute; that the dealing at appellee's place of business was solely on the market quotations of the Chicago Board of Trade, and that it knowingly permitted the pretended buying and selling by its customers of grain, with reference to such market quotations, and without any intention of receiving the grain ostensibly bought, or delivering that ostensibly sold, their only intention being to make money by the rise or fall of the market, as the case might be. Appellee's evidence was mainly directed to proving that a large part of the business of the Board of Trade of the city of Chicago was similar to that of appellee, namely, that grain was bought and sold on the exchange of the board on margins or stop-orders, without any intention to deliver the grain; and, incidentally, that there were some deliveries by and to appellee.

Appellee does a very large business. It is the lessee of the following telegraph wires, which it uses in its business: From Chicago to Davenport, Iowa; Chicago to Galesburg; Chicago to Louisville, Ky.; Chicago to Milwaukee; Chicago to St. Louis, and another wire from Aurora to Geneva, Ill.,

and from Canton to Quincy; from Decatur to Sycamore: from Freeport to Gainesville; from Galesburg to Burlington, Iowa; from Green Bay, Wis., to Menominee, Mich.; from Indianapolis, Ind., to Cincinnati, Ohio; from Lafayette, Ind., to Crawfordsville; from Louisville to Nashville, Tenn.; from Milwaukee, Wis., to Oshkosh; from Oshkosh to Green Bay; from Peoria, Ill., to Canton, Ill.; from Pontiac, Ill., to Fairbury, Ill.; from Rockford to Freeport, Ill.; from Springfield, Ill., to Decatur, Ill.; from Sycamore to Rockford, Ill. The wires that do not run to Chicago are part of the same system as the wires running to Chicago, and are connected with appellee's place of business in Chicago. Appellee has correspondents in places outside of Chicago, who act as brokers, for commission in buying and selling grain, and who send their orders to appellee in Chicago; and the evidence shows that appellee, although purporting to act as principal in the deals, shares in the commission of its correspondents. Elmer Southard, a clerk of appellee, who had, at the time of testifying, been in its employ two years, and whose business it was to keep books in which were recorded the trades made with appellee, testified that he took from the telegram conveying an order received from a correspondent, the number of the trade, the name of the customer, the quantity, the kind of commodity dealt in, and the price, which, when the telegram reached the witness, was marked on it in blue pencil, and he entered in his book the number of the trade, the price, and the price to which the margin would carry it, which was practically all. Illustrating, the witness testified :

"When, for instance, a telegram came opening a trade, if it is bought at seventy-five, we will know it is margined to seventy-four and one-eighth; that is the marginal price; it is generally one cent to all our customers."

The evidence shows that the deal is closed in such case as that stated, at seventy-four and one-eighth instead of seventy-four, because one-eighth is reserved from the margin as the commission of the correspondent or broker who sends the order. This witness also testified, that if an order was

to buy 1,000 wheat at seventy-five, with a stop at seventy-four, if the market should close one day at seventy-four and three-fourths and open the next day at seventy-three, the trade would be closed at seventy-four. Frank C. Williams, a clerk of appellee, whose duties were the same as those of the witness Southard, testified substantially the same as that witness.

W. E. Fildes testified that he had been a correspondent of appellee, at different places, for five years, the last place being Bloomington, Illinois, where he had been fourteen months, ending in May next, before his testimony was given. He testified substantially as follows:

"At my office in Bloomington there was a telegraph instrument, a blackboard and chairs and a desk or two. That office was upon one of the private wires running to the office of the complainant at Chicago, under an arrangement between myself and the complainant. Between the hours of nine in the morning and two in the afternoon the market quotations of the Chicago Board of Trade and the New York Stock Exchange came over that wire and were posted on the blackboard when they came in. There were persons sitting on the chairs where they could see the blackboard. These people would give orders to buy and sell grain or stocks, as the case might be; in stocks from ten shares upward and in grain from 1,000 bushels upward. These customers in placing orders made deposits of money —nothing less than one cent and upward on grain and stocks —one cent a bushel—that was usually the first amount of money that was paid as margins, which would be $10 on 1,000 bushels of grain and $10 on ten shares of stock. I would then send the order to the complainant over this wire and the money would follow later by what is called a bank wire. All orders would be telegraphed in over this wire. The orders would read, buy or sell the number of thousand bushels and the price, if stipulated, and otherwise it would be supposed to be the market price, and margin 1, or some of them would read margin 2. This would mean that that was all the money that was margined on the transactions, or supposed to be lost. On 1,000 bushels of grain M. 1, would mean $10, and M. 2 would mean $20, and on ten shares of stocks M. 1 would be $10. When this order was sent in to buy or sell, they would repeat back the message, whether it was margin 1 or margin 2. That would

indicate that that was all the money supposed to be lost or deposited on that transaction. If the telegram read, ' buy 1,000 bushels, seventy-five, margin 1,' it would indicate that it was supposed to be closed or exhausted at seventy-four and one-eighth. The commission of one-eighth added to the purchase price would make seventy-five and one-eighth net, and margined one cent per bushel would reduce the price down to seventy-four and one-eighth. That is also true of stocks. The complainants got their proportion of the commission of one-eighth and I got mine. Their portion in grain is twenty-five cents on a thousand; my portion would be $1. The commission on stocks would be one-quarter, or $2.25 for ten shares, of which the complainant would retain sixty-two and one-half cents. In the course of business between me and the complainant, if an order of that kind had been sent saying, ' buy 1,000 bushels of wheat, 75, margin 1,' and if the market declined to seventy-four and one-eighth, the man would lose $10. The loss on the transaction would be $10, and there would be no further telegrams between me and the complainant, because it was generally supposed when a man put up $10 and margined at one cent, he was watching the black-board, and could see when the market declined one cent a bushel, and take it for granted, so far as I know, that he was out of the market, and I make no further report to my customer about it, nor the complainant to me by wire. I would receive a statement by mail. This would show the price at which this transaction had gone out of the market or exhausted, whatever you wish to term it. The entire margin of $10 would be sent in by draft, or by telegraphic communication through the bank, and I would settle the difference with my customer, if there was anything coming to him; that was the end of it. After I gave an order to buy 1,000 at a given price, and mention margin 1 in the telegram, and the market went down below seventy-four and one-eighth, I would give no further order in the matter. That is the regular course of the business."

The witness further testified that in case a stop-order was put in at seventy-four, and the market closed at seventy-four and one-fourth one day, and opened the next at seventy-three and one-half, the trade would be stopped at the price mentioned in the stop-order, though the market never was at that price; also, that he, witness, never received nor delivered any grain nor handled any warehouse receipts, nor saw

any, in any of his transactions with appellee. On cross-examination this witness testified that he placed trades only with appellee, five or ten per day; that he might just as well have taken the trades himself so far as delivery was concerned; that he could not make delivery, not having the necessary capital to do so, and that his customers knew that both he and appellee ran bucket-shops; that such was the general opinion.

Other witnesses testified to having dealt in futures with appellee, or margins, and with reference to the market quotations, without any intention of receiving or delivering the grain bought or sold, and with the intention of settling on the differences in the market quotations.

The evidence shows clearly that the main part of appellee's business was dealing in futures on margins, without any intention of delivering the grain sold or receiving that purchased by it, and that it kept a bucket-shop, within the meaning of the statute, and used the market quotations in its bucket-shop business.

Appellee's counsel, in their argument, admit that "actual deliveries and receipts of commodities were not a large percentage of the business transacted," and this admission is fully sustained by the evidence. It appears that there were some deliveries of grain, but such were exceptional and insignificant in comparison with the bulk of appellee's business. It also appears from the evidence that appellee sent out delivery notices, and, in some cases, required persons to sign a contract to receive, but when the person receiving such notice, or signing such contract, objected to delivery, he had no difficulty in settling his trade with appellee by paying or receiving, as the case might be, the difference between the price at which the grain was bought or sold, and the price at which the trade was closed by stop-order or exhaust of margin.

The requiring a party who purchased or sold to sign a contract to accept or make delivery is an unusual circumstance, and not at all necessary in a *bona fide* transaction, the law in such case being that the party selling is bound

to deliver and the party purchasing is bound to accept delivery. Therefore, the purpose of such a contract must have been something other than the securing of a legal right.

Stockton, witness for defendant, testified that McHie, appellee's president, told him that the trades must be based on actual delivery, and that he, witness, would have to sign an agreement to that effect, which he did; but that after he made the agreement, although he sometimes made trades with appellee of 50,000 or 100,000 bushels of grain in a day, he never received from or delivered to appellee one bushel of grain, and never saw a warehouse receipt in any transaction he had with appellee. It also appears from the evidence that one of appellee's rules was, that if one of its correspondents sent an order by telegraph, the telegram should not contain a stop-order, but if a stop-order were intended, it must be sent by a second telegram. This, we think, was evidently for the purpose of preventing the original order from apparently showing that the proposed deal was purely speculative. In Soby v. The People, *supra*, the court say : "We are of opinion that it is no longer possible in this State, under any shift or device, however specious, to keep an office or other place where parties may, under the pretense of buying or selling grain or other produce, engage in speculation in futures, and gamble upon the rise and fall of the market," etc. The court ruled appellee to produce telegram received in its business since July 1, 1901; which it declined to do on the claim of constitutional privilege, which claim was allowed.

The witness Sanderson, clerk of appellee, testifies that he had, as such clerk, recorded on certain sheets trades made with appellee, and appellants moved for a rule on appellee to produce the sheets, which motion appellee resisted on the same claim of privilege, and the claim was allowed. A number of the witnesses, some of them officers of appellee, refused to answer questions relevant to the issues, on the like claim of privilege. When a party refuses to answer relevant questions, or to produce evidence in his possession, or subject to his control, the presumption is that the testi-

mony, if given, or the evidence, if produced, would be unfavorable to him. 1 Jones on Evidence, Section 17. Although such refusal, if based on the ground that the evidence might tend to criminate the party, could not be used against him in a criminal prosecution, we are inclined to the view that in a civil case the general rule, as above stated, is applicable. Evidence produced by appellee tending to prove that a large part of the transactions between members of the Board of Trade is on futures and purely speculative, and not different in kind from that done by appellee, is irrelevant. Appellee is seeking relief, not the Board of Trade nor any member of the board. It is certified by the learned judge who tried the cause, that "it was not necessary to a final disposition of said cause, to determine whether or not the complainant kept a bucket-shop," and that such was his view is evidenced by the decree, and also by his opinion, a copy of which is filed in the cause here. We are committed to the opposite view. Christie-Street Commission Co. v. Board of Trade et al., 94 Ill. App. 229.

That was a case similar to the present, in which the appellant, complainant in the lower court, prayed an injunction to restrain the defendants from refusing to furnish the complainant with the market quotations, and the defense in that case, as in this, was that the complainant was keeping a bucket-shop, and wanted the market quotations for use in that business. In that case we said:

" But aside from any question of pleading, we are of opinion that when it appeared to the chancellor that the aid of the court was sought to enable the complainant, appellant, to carry on an enterprise which was prohibited by the law, the chancellor could not do otherwise than deny the prayer. If it is not within the scope of chancery jurisdiction to punish or prevent crimes at the instance of private suitors, it is surely quite as far removed from the scope of equity to assist the law-breaker in his violation of the statute."

The injunction in the present case not only enjoins the appellant from refusing to furnish to appellee the market quotations, but it enjoins the Board of Trade from enforcing

the rule, Section 8, copied in the statement preceding this opinion.

The temporary injunction enjoined the appellants from "prohibiting any person, firm or corporation, being a member of the Board of Trade, from doing business with the complainant, the same as they do with other persons." The temporary injunction is made perpetual by the final decree. We are of opinion that the rule, enforcement of which is enjoined by the decree, does not infringe public policy or any rule of law, and that it is not unreasonable. Such being the case, it was error to enjoin its enforcement.

In Board of Trade v. Riordan, 94 Ill. App. 298, we reversed a decree enjoining the Board of Trade from trying a member of the board charged with a violation of the rule in question, citing numerous decisions. The decree will be reversed.