## Illinois Trust and Savings Bank, Adm., etc., v. Marian L. La Touche.

1. AMENDMENTS—*What is Not Setting up a New Cause of Action.*—An amendment to a declaration consisting of the common counts setting up that the defendant was indebted "to the plaintiff for money had and received, to wit, for money lost by him in gambling, to wit, in the pretended buying and selling of grain and stocks, whereby an action has accrued to the plaintiff according to section 132 of the Criminal Code of Illinois," does not state a new cause of action, for by the statute a recovery may be had for money lost at gambling under the common counts, as for money had and received.

2. GAMBLING—*When a Transaction in Grain is Prohibited by Statute.*—Where, in a transaction in grain, it appears to be the intention of the parties that the property sold is not to be actually delivered, but that a settlement is to be ultimately made between them upon the basis of the difference between the contract price and the market price, it is a wagering contract and prohibited by our statute.

Assumpsit.—Common counts. Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Heard in this court at the October term, 1901. Affirmed. Opinion filed March 20, 1902.

CUSTER, GODDARD & GRIFFIN and JOHN M. CAMERON, attorneys for appellant.

D. M. KIRTON, attorney for appellee.

MR. PRESIDING JUSTICE WINDES delivered the opinion of the court.

Appellee brought assumpsit against William H. Douglas

and William Martin, copartners as Douglas & Co., June 22, 1896, the declaration being the common counts. March 4, 1898, the death of Martin was suggested and the cause ordered to proceed against Douglas as surviving partner. He also died, and his administrator, the appellant, was made a party. After an additional count had been filed, issues were made and trial before the court and a jury resulted in a verdict in favor of appellee and judgment thereon, from which this appeal is taken.

The first ground of reversal relied on is that there was error in the court's rulings in overruling demurrers to a replication of plaintiff to each of the second and third special pleas to the additional count of the declaration filed December 6, 1900. After the death of both Martin and Douglas, on December 6, 1900, the additional count to the common counts was filed, by which it was charged in substance that said Douglas, deceased, surviving partner of Douglas & Co., was on June 20, 1896, indebted to plaintiff for money had and received, to wit, for money lost to said Douglas and Martin, then comprising the firm of Douglas & Co., by the plaintiff in gambling, to wit, in the pretended buying and selling of grain and stocks, whereby an action had accrued to the plaintiff, according to section 132 of the Criminal Code of Illinois. To this additional count appellant, among other pleas, filed said second plea, which is in substance that the cause of action set up in the additional count did not accrue to the plaintiff at any time within six months before the death of said Douglas; also appellant on December 18, 1901, filed said third special plea, which is the same in substance as said second plea, and in addition alleges that said Douglas died June 25, 1899. It is unnecessary to consider the sufficiency of the replications to these pleas, for if they are bad for any reason, and the pleas were also bad, the demurrers to the replications should have been carried back to the pleas.

The additional count does not state a new cause of action. By the statute a recovery may be had for money lost at gambling under the common counts, as for money had and

received.   The additional count, as above shown, only sets out specially a cause of action in that regard, basing it upon the statute.   The proof to support it would be the same as under the common counts, and we therefore think it does not state a new and different cause of action from the common counts, which, by virtue of the statute, are sufficient to justify a recovery for money lost at gambling.

The additional count not stating a new cause of action, these pleas are bad, and the appellant's demurrer to the replications thereto should have been carried back to the pleas.

It is contended that as to the third plea, a demurrer by the plaintiff to that plea having been overruled, the appellant's demurrer to the replication can not be carried back to his plea, because by replying to the plea the original demurrer thereto was waived.   The claim is not tenable.   It is not the plaintiff's demurrer which is being considered, but the appellant's demurrer to the plaintiff's replication; and it is carried back, not to the plaintiff's pleading, but to the appellant's bad pleas.   Stephen's Pldg. (Heard's Ed.), 143.

Next, it is said there could be no recovery under the common counts for money lost at gambling, without an allegation that the action accrued by the statute.   It is unnecessary, if the money sought to be recovered was lost at gambling, to base the recovery on the common counts, because the evidence shows enough and more of plaintiff's money was lost within the time limited by the statute, than the amount of the judgment.   The recovery, under this evidence, could rest on the additional count, the appellant having failed to show a defense under its pleas of the statute of limitations.   One good count is sufficient to sustain a judgment when the evidence justifies it.   But it is further claimed that the evidence does not prove that money was lost by the plaintiff to Douglas & Co. at gambling; also that it is insufficient to sustain the verdict on any other ground.

The defendant offered no evidence, and because Douglas and Martin were both dead, the plaintiff could not testify.

The only evidence was that of an errand boy, who at the time of the transactions in question was between eleven and twelve years old, and certain checks of plaintiff, payable to the order of Douglas & Co., which were indorsed by them and placed to their credit in the Illinois Trust and Savings Bank.

The boy testified in substance that he ran errands for plaintiff from September 20, 1895, to June, 1896, and took orders from her to Douglas & Co. to buy and sell stocks; that "she did all her business by writing letters, which I would carry. They were not put in sealed envelopes. I read them when I was taking them over there;" that these letters were destroyed; that "When I took an order in from Mrs. LaTouche, they took the order and would go to the ticker, an instrument he had there to quote stocks, and say, 'You have got it,' or 'You have not got it.' If he accepted the order he would say, 'You have got it.' If he did not accept the order he would say, 'You have not got it.' Both of the firm took these orders, or refused them. A ticker is an instrument that quoted stocks on a tape—the price of stocks. They would just get hold of the tape and look at it and tell me whether they had the order or did not have the order. That was the method of their doing business there doing the whole time I was acting as errand boy." He also testified to the names of different stocks upon which orders were given; that the checks offered in evidence were "paid for margins for stocks. Margin means money put up;" that between December 23, 1895, and May 29, 1896, aside from the checks, he took to Douglas & Co., he thinks, between $1,000 and $1,500 in cash; also, viz.:

"Q. What, if anything, was said by Douglas & Co. when you came in, if you did come in, about offering to put up further security? A. Sometimes he would say they were froze out. Mr. Douglas would say that. That occurred quite often.

Q. When he said they were froze out, would they accept further money? A. No, sir; would take the money back to Mrs. LaTouche.

Q. Do you know these defendants, what they did?

Illinois Trust & Savings Bank v. La Touche.

After you gave them an order to buy, what would you say to them when you gave an order from Mrs. LaTouche to them? (No answer.)

Q. What did you say to them and what did they say to you in response? A. I would say, 'Here is an order to buy stock,' and would give them the order, and they would take the order and look at it; then they would go to the ticker and see if it was the same price and would say, 'Have got it;' sometimes they would say, 'Can not have it.' The money was put up on the orders he said 'you could have.' Sometimes they would ask margins and sometimes they would not take any margins any more. When they would not take margins they would say, 'It is froze out.'

Q. Before they said 'it is froze out' in this transaction, in that condition, did you or did you not give them any orders to close out at all? A. She did not give me any orders to close out. I did not give Douglas & Co. any orders to close out on these prices they said was froze out. I did not give them any orders.

Q. Did you ever have any shares of stock delivered to you on these transactions—certificates of stock? A. No, sir.

Q. Did you ever tender them any shares of stock on any of these transactions, or offer them any? A. I took them an order. I did not take stock or certificates of stock and offer them to them. Douglas & Co. received commissions of a quarter of a dollar on a share. Before they told me at the times I went in there that certain stocks were froze out, they had not called on me to put up more money before telling me that."

He also said that he didn't know how much of the money was for any one stock, nor how much was for buying, nor how much was for selling, but that it was for both buying and selling.

In view of this evidence we think the case was properly submitted to the jury, both as to whether the transactions between plaintiff and Douglas & Co. were that of gambling in stocks, and as to whether plaintiff was entitled to recover as for money had and received by Douglas & Co. as for margins or security on the purchases and sales of stocks which were wrongfully closed out by Douglas & Co. without authority of plaintiff. And it can not be said that on either point the verdict has no support from the evidence.

As to whether the evidence was sufficient to be submitted to the jury on the former of these questions, we think the following authorities are pertinent and sustain the action of the learned trial judge in that regard: Beveridge v. Hewitt, 8 Brad. 467–76; Colderwood v. McCrea, 11 Id. 543; Kennedy v. Stout, 26 Id. 133; Miles v. Andrews, 40 Id. 155; Pierce v. Foote, 113 Ill. 228; Cothran v. Ellis, 125 Ill. 498; Board of Trade v. Central S. & G. Exchange, 98 Ill. App. 212, and cases cited.

In the Beveridge case, *supra*, this court, in speaking of transactions in grain upon the Board of Trade in Chicago, somewhat similar to the transactions here in question, said:

" The form of the contract, however, is by no means conclusive of the true nature of the transaction. That must be determined from the real intentions of the parties. If it appears to be their intention that the property sold is not to be actually delivered, but that a settlement is to be ultimately made between them upon the basis of the difference between the contract and market price, it is, notwithstanding its form, a wagering contract, void at common law, and prohibited by our statute."

To the same effect in substance are the Colderwood, Kennedy and Miles cases, *supra*. And in the Kennedy case it was said:

" If a person enter into a contract with his broker or commission man, which is a mere gambling contract, and pays to him money or property to cover losses sustained thereby, then such broker or commission man is a ' winner ' within the meaning of section 132 of the Criminal Code, and such person is given a remedy by said section of the statute against such broker or commission man for the recovery of such money or property."

In the case of Soby v. The People, 134 Ill. 66, cited in the case of the Board of Trade, *supra*, it was held in effect that the test as to whether or not a transaction in buying or selling grain comes within the prohibition of this statute, is that it was not contemplated that there should be an actual delivery of the grain bought or sold. In the case at bar we think the evidence was sufficient to justify a finding

that there was no intention that the stocks bought or sold were to be delivered, but that the intention was to settle upon the basis of differences between the contract and market prices at different times.

As to the latter question we also think the following authorities sustain the court's action: Markham v. Jaudon, 41 N. Y. 235; Bryan v. Baldwin, 52 N. Y. 232; Perin v. Parker, 17 Brad. 169; Walker v. Johnson, 59 Ill. App. 448; Denton v. Jackson, 106 Ill. 433; Corbett v. Underwood, 83 Ill. 324; Cook on Stockholders, Sec. 458.

In the case of Denton, *supra*, where a commission merchant made purchases on the Board of Trade of commodities for a customer for future delivery, the customer having advanced the necessary margins, it was held, if there was no contract between the parties as to what notice should be given in case the commission merchant was compelled to secure himself against loss by a sale of the property, and there was no rule of the Board of Trade governing in such matter, then, at the common law, a reasonable notice and opportunity should have been given by the commission merchant to his customer to make his margins good, and that if such notice was not given and the property sold without authority of the customer, the commission merchant would be liable for any loss which resulted. To the same effect in substance is the case of Perin, *supra*, the opinion being delivered by Mr. Justice McAllister, in which it was said, in substance, that by the common law the broker or commission merchant would (the court referring to facts which were quite similar to the facts at bar) " be required as a condition precedent to the right, of his own mere volition, to buy in the grain for account of his principal, deliver it upon the previous sale made by such broker for that principal, and hold the latter responsible for the loss, to give such principal reasonable notice and opportunity to furnish the requisite margins."

No notice whatever appears to have been given by her brokers to appellee to furnish further margins, and it appears that she placed with them whatever in the way of

margins they asked. She gave no orders to close the different trades. They simply told her agent that (to use his language) "the stocks were froze out."

What we have said sufficiently disposes of the first four instructions given at the instance of plaintiff, which it is claimed are not justified by the evidence. Complaint is made of the plaintiff's fifth instruction, because it does not define gambling transactions. The jury was sufficiently informed by plaintiff's instruction two, about what constituted a gambling transaction.

There was no prejudicial error in refusing appellant's instruction, which in effect told the jury there could be no recovery as to any gambling transactions which occurred more than six months before the commencement of the suit. As has been stated, there is evidence of such transactions which would amount to more than the verdict. Also it seems apparent the jury was guided by plaintiff's second instruction, which in effect told the jury if they believed the transactions were that of gambling, there could be an allowance for such as occurred between December 23, 1895, and May 29, 1896.

We think some remarks of counsel of which complaint is made, were not altogether justified by the evidence. The statement of plaintiff's counsel during the progress of the trial, that it was admitted Douglas & Co.'s place was a bucket shop, was improper, so far as appears from the record, but there was no ruling upon the objection of counsel, made at the time. We are of opinion that in the record in these respects there is no reversible error.

The judgment as originally entered, being against Martin, whose death had long before been suggested on the record, and appellant jointly, was erroneous. This, however, appears to have been a clerical error, and it was corrected subsequently, as shown by a supplemental record.

Appellant's claim that the damages are excessive is answered by what has been previously said.

Being of opinion that there is no reversible error in the record, the judgment is affirmed.