WILLIAM SOBY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield June 12, 1890.*

1. BUCKET-SHOPS—*gambling in stocks, grain, etc.—act of 1887—scope and purpose of the act.* The act of 1887, entitled "An act to suppress bucket-shops, and gambling in stocks," etc., is directed against the keeping of any office or place, etc., wherein is conducted or permitted the pretended buying or selling of grain or other produce, on margins or otherwise, without any intention of receiving or delivering the prop-erty bought or sold.

2. The statute makes it an offense to keep a place, office, etc., wherein is conducted or permitted the pretended buying or selling of produce on margins.

3. For the purpose of preventing the evils resulting from such shops, and bucket-shopping, and of suppressing the vice of gambling in grain, it was intended by that act to close, suppress and prohibit the keeping of places where the practice of bucket-shopping or gambling in grain is permitted.

4. SAME—*intention—want of knowledge—as a defense.* It is not necessary to show the intention of the keeper of the office or place of business to bring the transaction within the prohibition of the statute. So the keeper of such office or place can not shield himself from crim-inal responsibility behind the fact that he made no inquiry of his cus-tomers. The keeper must know that the transactions at his office are

not gambling, or he must have just reason to believe that the buying or selling is not within the intended prohibition of the statute.

5. SAME—*want of intention to consummate the bargain.* The offense is complete where the party buying such produce, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold.

6. SAME—*actual purchase to protect the buyer—effect on the character of the transaction.* Where a purchase of grain is made by an agent, and no delivery is intended, it being a speculation on the rise and fall of the market, the fact that the principal has made purchases in good faith of like amounts of grain to protect himself, will not change the nature of the transaction with the agent, and free it from the taint of gambling.

7. SAME—*agency—no excuse for violating the statute.* If it is made unlawful to keep an office or place at which grain is illegally bought or sold under gambling contracts, it can make no difference that the person keeping such office is acting as the agent of another who makes purchases or sales on the Board of Trade for his customers. Such an agent is by the act made punishable, the same as his principal.

8. The command of a superior to an inferior, as, of a military officer to a subordinate, or of a parent to a child, will not justify a criminal act done in pursuance of it; nor will the command of a master to his servant, or of a principal to his agent.

9. CONSTRUCTION OF STATUTES—*rule of construction.* In construing a statute, the primary consideration is to ascertain and give effect to the legislative intention. In order to accomplish this object, the court should look at the whole act, and seek to ascertain such intention by an examination and comparison of its various provisions. The court may also consider other and prior acts relating to the same general subject, and thus ascertain what mischiefs the later legislation was designed to remedy, and the true spirit and import of such legislation.

10. The courts are not permitted, by the rules of construction, to extend the body of an act by reference to its title, but they may consider the title for the purpose of determining what was within the legislative contemplation.

WRIT OF ERROR to the Circuit Court of Morgan county; the Hon. CYRUS EPLER, Judge, presiding.

Mr. EDWARD L. McDONALD, and Mr. H. G. WHITLOCK, for the plaintiff in error.

Mr. GEORGE HUNT, Attorney General, and Mr. CHARLES A. BARNES, State's Attorney, for the People.

Mr. Justice Baker delivered the opinion of the Court:

The plaintiff in error, William Soby, was indicted and convicted in the Morgan circuit court for violation of the act of the legislature entitled "An act to suppress bucket-shops, and gambling in stocks, bonds, petroleum, cotton, grain, provisions and other produce," in force July 1, 1887. (3 Starr & Curtis' Ann. Stat. p. 165.) The first and second sections of the act are as follows:

"Sec. 1. That it shall be unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this State any bucket-shop, office, store, or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum, cotton, grain, provisions or other produce, either on margins or otherwise, without any intention of receiving and paying for the property so bought or of delivering the property so sold, or wherein is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold; and the keeping of all such places is hereby prohibited. And any corporation or person, whether acting individually, or as a member, or as an officer, agent or employe of any corporation, association or co-partnership, who shall be guilty of violating this section, shall, upon conviction thereof, be fined in any sum not less than $200 and not more than $500; and any person or persons who shall be guilty of a second offense under this statute, in addition to the penalty above prescribed, shall, upon conviction, be imprisoned in the county jail for the period of six months, and, if a corporation, shall be liable to forfeiture of its charter; and the continuance of such establishment after first conviction shall be deemed a second offense.

"Sec. 2. It shall not be necessary, in order to commit the offense defined in section 1 of this act, that both the buyer and the seller shall agree to do any of the acts therein prohibited, but the said crime shall be complete against any corporation, association, co-partnership or person thus pretending or offering to sell, or thus pretending or offering to buy, whether the offer to sell or buy is accepted or not; and any corporation, association, co-partnership or person who shall communicate, receive, exhibit or display, in any manner, any such offer to so buy or sell, or any statements or quotations of the prices of any such property, with a view to any such transaction as aforesaid, shall be deemed an accessory, and, upon conviction thereof, shall be fined and punished the same as the principal, and as provided in section 1 of this act."

The fourth section of the act is as follows : "Whoever knowingly permits any of the illegal acts aforesaid in his building, house, or in any out-house, booth, arbor or erection of which he has the care or possession, shall be fined not less than $500 nor more than $1000, and any penalty so adjudged shall be a lien upon the premises on or in which such unlawful acts are carried on or permitted. It is the intention of this act to prevent, punish and prohibit, within this State, the business now engaged in and conducted in places commonly known and designated as bucket-shops, and also to include the practice now commonly known as bucket-shopping, by persons, corporations, associations or co-partnerships who ostensibly carry on the business or occupation of commission merchants, or brokers in grain, provisions, petroleum, stocks and bonds; and it shall be the duty, under this act, of all the judges of the several circuit courts,  *  *  *  at every regular term thereof, to charge all regularly impaneled grand juries to make due investigation, and report upon all violations of the provisions of this act."

It appears from the evidence that the plaintiff in error had an office in Jacksonville, in this State, where he transacted

what he called a grain commission business, as agent of Robert Lindbloom & Co., members of the Board of Trade of Chicago. He received daily, by telegraph, from 9 :30 A. M. to 1 P. M., and from 2 to 3 o'clock P. M., quotations of the Chicago, New York, St. Louis and Liverpool markets, on wheat, corn, oats, pork, lard, etc., which he displayed, as received, upon a blackboard, for public inspection. He professed to buy and sell such products on the Chicago market, receiving from his customers a margin of two cents per bushel on wheat and corn, unless the customer wished to limit his "loss," when a margin of one cent was required. In the latter case "the deal would be closed out if the market declined one cent." With a two-cent margin, if wheat declined he "would collect more margins." There was to be no "delivery unless the option matured." The defendant says : "I kept an office where we were buying and selling on the Chicago market. Bought and sold on margins. The object of my displaying quotations on the blackboard was to show the people what the market was. They could buy if they wished to do so. I kept them there with a view to selling or buying on margins. My business will average 10,000 bushels a day." He also says : "I have not bought or sold a bushel of wheat since I have been in Jacksonville. I never asked the intention of customers. Customers could have grain delivered to them if they wished."

It appears from the evidence that Charles James bought 5000 bushels of wheat and 5000 bushels of corn, and put up with the defendant two cents margin per bushel. He bought in October, for May delivery, and closed the deal in a few days at an advance on his margins. He says : "My intention was to make money out of it, by buying and selling it on the fluctuations of the market." He neither got nor delivered any grain when he bought or sold. He says : "I was to pay nothing but the margin of two cents until May, unless necessary. Would have had to put up more margins if the first had been absorbed by the price going down. If I did not do this the

grain would have been sold out. Did not get grain for actual use, but to make money out of it."

In construing a statute, the primary consideration is to ascertain and give effect to the legislative intention. In order to accomplish this object the court should look at the whole act, and seek to ascertain such intention by an examination and comparison of its various provisions. (*Mason* v. *Finch,* 2 Scam. 223; *People* v. *Canal Comrs.* 3 id. 153; *Perteet* v. *People,* 65 Ill. 230.) The court may also consider other and prior acts relating to the same general subject, and thus ascertain what mischiefs the later legislation was designed to remedy, and the true spirit and import of such legislation. *Stribling* v. *Prettyman,* 57 Ill. 371.

By the revised Criminal Code of 1874 it was made a criminal offense to contract to have or give the option to sell or buy, at a future time, any grain or other commodity, etc., and it was provided that all contracts made in violation of such law should be considered gambling contracts, and should be void. It was held, under that statute, that even though a contract purported upon its face to be an absolute contract for the sale or purchase of grain or other commodity for future delivery, yet the transaction would be a gambling contract, within the prohibition of the statute, if the real intention of both parties, at the time of making the contract, was to deal only in options, and make future settlement upon the basis of the differences in the market price, without the actual delivery of the grain or other commodity sold or purchased. But it was also held, under the same statute, in numerous cases, that if either party contracted in good faith, the contract was a valid and binding contract, no matter what may have been the secret intention of the other party.

It is manifest that the object of the statute was to suppress and prevent gambling in grain and other commodities; but so great was the difficulty of establishing the unlawful intent of the parties making illegal contracts, and so many were the

shifts and devices resorted to for the purpose of concealing the true character of the gambling transactions entered into, that the statute was found to be ineffectual to accomplish the purpose for which it was enacted. It is a matter of common notoriety, that, notwithstanding the highly penal character of the statute of 1874, the evil it was aimed at continued to increase with wonderful rapidity throughout the State, and until in almost every city or town of any considerable importance, commission houses, offices or agencies were established, in which the great bulk of the business transacted was the making of contracts which, while legitimate upon their face, were in fact mere gambling transactions, which were never allowed to mature, but were uniformly adjusted before maturity upon differences in market price, and without any actual delivery of the articles which were the subject matters of such pretended contracts. To remedy the mischief, the legislature, satisfied of the futility of attempting to suppress gambling in grain and other commodities by striking merely at the gambling contracts themselves and the parties entering into such contracts, has sought, by the statute of 1887, to suppress all bucket-shops, offices, stores, or other places wherein gambling in grain or other commodities is conducted or permitted, and to do this, punishing by fine, imprisonment or forfeiture of charter, any person, co-partnership, association or corporation that keeps or causes to be kept a place of that character within the State, and also punishing, by a fine of not less than $500 nor more than $1000, the owner of any building who knowingly permits on his premises any of the illegal acts denounced by the statute.

It would seem clear, from the evidence, that the plaintiff in error kept an office or place wherein was "conducted or permitted" the buying or selling of grain or other produce on margins, "without any intention of receiving and paying for the property so bought or of delivering the property so sold," and wherein was "conducted or permitted the pretended buying or selling of such property on margins," and "where the party

buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased or to deliver the same if sold."

A consideration of the act will, as before indicated, show that it is directed against the keeping of any office or place, etc., first, wherein is conducted or permitted the pretended buying or selling of grain or other produce, on margins or otherwise, without any intention of receiving the property bought or delivering it if sold. Under this clause of the first section, the offense consists in keeping the place, etc., where such buying or selling is conducted or permitted. That plaintiff in error kept the office or place is conceded, and that buying and selling upon margins, without any intention on the part of the customer to receive the thing bought or to deliver the thing sold, was permitted in such office or place so kept by the plaintiff in error, is also substantially conceded, and if it were not, is abundantly proved. Under this provision of the act, the keeper of such office or place, etc., can not shield himself from criminal responsibility behind the fact that he made no inquiry of his customers. The statute is preventive in its character, and is aimed at the keeping of places where gambling in grain is permitted. The keeper must know that the transaction is not gambling, or, in good faith, have just reason to believe that the buying or selling is not within the intended prohibition of the statute. But if this were not so, there is abundant evidence in this record to show that the plaintiff in error knew that his customers did not contemplate an actual delivery of the commodity bought or sold.

Again, the second clause makes it an offense to keep a place, etc., wherein is conducted or permitted the pretended buying or selling of such produce on margins. It is scarcely contended that the customer did not, in fact, intend only to purchase options, and to make money in the rise and fall of the market, without any expectation of receiving or delivering grain. In other words, it is too plain for argument, that the buying and

selling of grain was a mere pretense, at least so far as the customer was concerned.

Again, the third clause creates the offense where the party buying such produce, or offering to buy the same, does not intend actually to receive the same if purchased or to deliver the same if sold. Here the proof establishes, beyond question, that purchases were made without any intention of receiving the commodity purchased. The only object was to make money on the fluctuations of the market by the pretended purchase of the grain on margins.

It is, however, insisted, that plaintiff in error took orders from persons who wished to buy or sell grain, and sent them by telegraph to Lindbloom & Co., his employers, who were members of the Chicago Board of Trade, and that Lindbloom & Co. went upon the Board of Trade and executed the orders, and then reported the fact of such execution to the plaintiff in error, and he to the customer. These customers, at the time of making the orders, deposited a margin, which was to secure Lindbloom & Co. against loss if the grain declined or raised, as the case might be, and if it declined or raised sufficiently to exhaust the deposited margins, the customers were required to make and keep the margins good.

It is said that the fact that the business of plaintiff in error was thus conducted shows that it was a straightforward, legitimate business, "with no relation to or connection with a bucket-shop or bucket-shopping." Counsel lose sight of the fact that the circumstance that plaintiff in error was claiming to act as an agent of or was in fact acting as an agent of Lindbloom & Co., can not absolve him from liability. If it was unlawful to keep the office or place, it can make no difference that he was their agent. It is expressly provided in the statute, that any agent or employe of any corporation, association or co-partnership, who shall be guilty of keeping or causing to be kept any of the places before mentioned, for the purposes prohibited, shall, upon conviction, suffer the penalty imposed by

the act. But if it were not so provided in the act, he would be liable upon common law principles, notwithstanding his agency. Bishop, in his work on Criminal Law, (vol. 1, sec. 355,) formulates the rule thus: "The command of a superior to an inferior, as, of a military officer to a subordinate, or of a parent to a child, will not justify a criminal act done in pursuance of it; nor will the command of a master to his servant, or of a principal to his agent; but in all these cases the person doing the wrongful thing is guilty, the same as though he had proceeded self-moved."

Nor can the fact that Lindbloom & Co. may have gone on to the Board of Trade and made like contracts of purchase or sale, avail plaintiff in error. As before said, the act is intended to prevent the keeping of places where gambling in grain is conducted or permitted. If the employers of plaintiff in error, in order to protect themselves, made, even in good faith, purchases or sales of like amounts of grain or produce, it would not change the nature of the transaction which had transpired between plaintiff in error and his customer, so as to free it from the taint of gambling, since in respect of such customer it would still be a mere gambling upon margins—a mere speculating upon the rise and fall of the market.

It is apparent from the whole act, from the title to the concluding sentence, that the purpose and object of the legislature was to suppress the evil of gambling in produce. Primarily, it was intended to reach and suppress the bucket-shop and bucket-shopping, from which much of the evil sought to be corrected necessarily flows. But it is manifest, that, probably owing to the difficulty of securing conviction where all the elements to constitute a bucket-shop or the practice of bucket-shopping, as the same have been defined in the decisions of the courts, are required to be established, the legislature saw proper to strike a fatal blow at both bucket-shops and bucket-shopping by prohibiting the keeping of all offices, places, etc., where gambling in grain or other produce is carried on or

permitted. There can be no question but that the evil of gambling in futures was present in the business carried on by plaintiff in error. There is in the evidence even just ground for the conclusion that it was present, to all intents and purposes, as fully as if his office had been denominated a bucket-shop, instead of an agency or a commission house. The shifts and devices so easily and frequently resorted to for the purpose of giving to transactions tainted with gambling the semblance of legitimate deals, were sufficient considerations, in the legislative judgment, to require, as a matter of public policy, that all places wherein is conducted or permitted the pretended buying or selling of property such as is specified in the act, on margins or otherwise, shall be prohibited. If two firms, members of the Board of Trade, could be found who were willing to enter into such a scheme, it is manifest that, one firm representing agencies in half the commercial centers of the State, and the other representing the other half, could buy or sell, to fill the orders of their respective agents, from each other, receive the margins, and "ring out their deals" without a bushel of grain or pound of any other commodity changing hands. Yet if either demanded the grain or other product of the other, the contract would be so drawn as to be a valid sale and purchase of the produce itself, and they could, without legal perjury, testify that it was to be delivered if desired by the party entitled to it under the contract. By such means the State would still be subject to all the evils of the bucket-shop and bucket-shopping.

We are not permitted, by the rules of construction, to extend the body of the act by reference to its title, which is, "An act to suppress bucket-shops, *and* gambling in stocks, bonds, petroleum, cotton, grain, provisions and other produce," but we may consider it for the purpose of determining what was within legislative contemplation. (*Perry County* v. *Jefferson County,* 94 Ill. 214.) The legislature, by the fourth section, as we have seen, declares that it is the intention of this act to prevent,

punish and prohibit within this State the business now engaged in and conducted in places *commonly known* and designated as bucket-shops, and also to include the practice now *commonly known* as bucket-shopping, etc. To accomplish this purpose the legislature has prohibited the keeping of the places where what is *commonly known* as bucket-shopping is carried on. They have not in the body of the act prohibited the keeping of bucket-shops, or the practice of bucket-shopping, only, but have included the keeping of every place wherein is conducted or permitted gambling in grain or other produce, and have expressly provided that it shall not be necessary, in order to commit the offense, that both the buyer and seller shall agree to do any of the acts therein prohibited. By the act, the mere offer by the corporation or person keeping such place to make such pretended sale or purchase, whether the offer to sell or buy is accepted or not, renders the offense complete against such corporation or person. Such corporation or person is also prohibited from communicating, receiving, exhibiting or displaying, in any manner, any such offer to so buy or sell, or any statement or quotation of the prices of such property, with a view to any transaction of the kind prohibited. Moreover, as we have already seen, the person knowingly permitting any of the acts prohibited by the statute in any house or place owned by him, is subjected to a heavy penalty.

It is apparent, we think, that the legislature, for the purpose of carrying into effect their expressed intention of preventing the evils resulting from bucket-shops and bucket-shopping, and to suppress the vice of gambling in grain and other produce, so detrimental to the interests and welfare of the people, have determined to close, suppress and prohibit the keeping of places where the practice of bucket-shopping or gambling in such commodities is permitted. No other construction of the act would be consistent either with its letter or spirit. We are of opinion that it is no longer possible in this State, under any shift or device, however specious, to keep an office or other

place where parties may, under the pretense of buying or selling grain or other produce, engage in speculation in futures, and gamble upon the rise and fall of the market, and, as we have seen, the legislature have, as they might, rendered it unnecessary to show the intention of the keeper of the office or place, to bring the transaction within the prohibition of the statute. All legitimate commercial transactions, whether upon the Board of Trade or elsewhere, must be upheld and enforced, and it may undoubtedly be true that agencies might be established throughout the State for carrying on such legitimate business; but this agency manifestly was not of that character.

The conviction was fully warranted under the first and second counts of the indictment, and must be sustained. The first and second counts being sufficient to sustain a conviction, we are relieved of the necessity of determining whether the sixth count was good or not.

We have carefully considered the entire record, and find no error therein. The judgment of the Appellate Court is accordingly affirmed.

*Judgment affirmed.*