THE WEARE COMMISSION COMPANY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 20, 1904—Rehearing denied June 8, 1904.*

1. BUCKET-SHOPS—*keeper is presumed to have notice of what is going on.* One who keeps an office where gambling transactions in grain or produce are carried on is presumed to have knowledge of such fact without proof on the part of the prosecution.

2. SAME—*question of intention is for the jury.* The intention of the parties to a transaction in grain, alleged to be in violation of the statute, is a question for the jury, to be determined from all the evidence.

3. SAME—*what shows participation in illegal intent.* Participation by a commission firm in the illegal intent of a customer is shown by evidence that the firm maintained an office in charge of an agent, who received orders for future delivery of grain on deposit of a margin and transmitted the order to the firm, which filled it in its own name and sold on a rise before time for delivery, crediting the profit to the customer.

4. SAME—*what does not show intention to make actual delivery of grain.* Intention to make actual delivery of grain is not necessarily shown by the fact that the printed circular sent by the brokers to their customers stipulated for actual delivery, and that the agent who took the customer's order on deposit of a margin inquired if the customer intended to take the grain.

5. SAME—*broker cannot relieve himself of responsibility on the ground of agency.* A commission firm which maintains an office where gambling transactions in grain and produce are permitted, cannot shield itself from criminal responsibility upon the ground that it acted as agent for the customers in the unlawful transactions.

6. SAME—*act of 1887 is not confined to bucket-shops.* The act of 1887, prohibiting gambling in grain or produce, (Laws of 1887, p. 96,) was intended to suppress all places where gambling in grain or produce is permitted, whether in bucket-shops or in offices maintained by members of the Chicago Board of Trade. (*Soby* v. *People*, 134 Ill. 66, adhered to.)

7. SAME—*place where the office is kept and orders given is place where offense was committed.* The place where the office is kept where the agent in charge meets the customers and receives their orders and margins in unlawful transactions in grain and produce is the place where the offense is committed, although the proprietor of the office does buying and selling in his own name in another county.

8. CONSTITUTIONAL LAW—*act of 1887, to suppress gambling in grain, is constitutional.*   The act of 1887, (Laws of 1887, p. 96,) prohibiting the keeping of places where gambling in grain or produce is permitted, is constitutional.

*Weare Commission Co.* v. *People,* 111 Ill. App. 116, affirmed.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Bureau county; the Hon. GEORGE W. BROWN, Judge, presiding.

This is an indictment against the plaintiff in error, returned on January 9, 1903, into the circuit court of Bureau county by the grand jury of that county, charging that the plaintiff in error, a corporation, on the 20th day of September, 1901, "and on divers other dates and times between that day and the finding of this indictment, in the city of Princeton, in the said county of Bureau and State aforesaid, did unlawfully keep an office wherein there was then and there permitted the pretended buying of grain on margins without any intention of receiving the grain so bought, contrary to the form of the statute," etc.   The charge in the indictment against the plaintiff in error, as above quoted, was embodied in the fifth count of the indictment; and the plaintiff in error was convicted under section 1 of an act entitled "An act to suppress bucket-shops, and gambling in stocks, bonds petroleum, cotton, grain provisions and other produce," in force July 1, 1887.   Sections 1, 2 and 4 of this act of 1887 are set forth in *Soby* v. *People,* 134 Ill. 66.   A motion to quash the indictment was denied, and plaintiff in error pleaded not guilty, and, a jury being waived, the cause was tried before the court without a jury; and the court adjudged plaintiff in error guilty, and imposed a fine of $200.00.   From the judgment of conviction, so entered by the circuit court, an appeal was taken to the Appellate Court, and the Appellate Court, holding that, although an appeal does not lie in a criminal case, yet where the People do not move to

209—34

dismiss, but file briefs, as was done here, the Appellate Court is at liberty to treat the case as if pending on a writ of error,—disposed of the case accordingly in accordance with decisions made by it in *Ferrias* v. *People*, 71 Ill. App. 559, and cases there cited; and *Reddish* v. *People*, 83 id. 63; and thereupon affirmed the judgment of the trial court. The present writ of error is sued out for the purpose of reviewing the judgment of affirmance, so entered by the Appellate Court.

The case was tried upon a written stipulation of facts, which were agreed by the parties to be taken as true, with leave to either party to introduce such further evidence, as might be competent. The only evidence, introduced by the People besides that embodied in said stipulation, was the testimony of two witnesses, Theodore Kruse and Thomas Cecil, who were customers of the plaintiff in error at its office in Princeton. The plaintiff in error, defendant below, introduced no testimony, except certain rules and by-laws of the Board of Trade of the city of Chicago, being a statement of the objects of the association; sections 8, 9, 10 and 11 of rule 4; sections 1 and 2 of rule 14; sections 1 and 2 of rule 22; and sections 1 and 2 of rule 23.

At the close of the evidence, the plaintiff in error moved the court to find it not guilty, on the ground that the evidence was, as matter of law, insufficient to justify its conviction; it also moved that the court exclude from its consideration the evidence offered on behalf of the People, on the ground that the conviction of the plaintiff in error under the evidence would be in violation of the fourteenth amendment of the constitution of the United States; and it further moved the court to find it not guilty, on the ground that its conviction under the evidence would be in violation of said fourteenth amendment to the Federal constitution; all of which motions the trial court overruled, and to such rulings the plaintiff in error excepted.

The plaintiff in error also requested the court to hold, as law in the decision of the case, three written propositions, which were marked "refused" by the court. So much of the facts, as are not stated in the opinion, were thus stated by the Appellate Court in its opinion deciding this case:

"Defendant is a corporation engaged in the commission business and has its principal office in Chicago. On February 6, 1902, it opened a branch office at Princeton, and placed it in charge of F. E. Flower as its agent, and said office was conducted by Flower for defendant during the period covered by the indictment. The prices, at which grain and other commodities were selling on the Chicago Board of Trade, were from time to time communicated by telegraph to the branch office, and there displayed on a blackboard to inform defendant's customers of such prices, with a view to enabling defendant to obtain business from said customers. Flower received orders from defendant's customers at Princeton for the purchase or sale of grain, etc., and transmitted said orders by telegraph to the defendant at Chicago. Defendant received the orders at Chicago, and executed them in its own name upon the Chicago Board of Trade, and reported the transactions by telegraph to its agent at Princeton, and he reported the transactions verbally to the customers. Defendant also mailed to each customer a report upon a printed blank, filled out with the details of the transaction. Each such report contained the following printed statement: 'It is distinctly understood and agreed to by you that actual delivery of property herein mentioned is contemplated.' When a customer gave an order to defendant's agent at Princeton for the purchase or sale of grain, he was required to deposit a margin of not less than two cents per bushel on the amount of grain, so ordered bought or sold. If the market changed against the customer, he was required to furnish an additional margin. If he refused, defendant would

dispose of the grain so bought or sold, and charge the customer with the loss or credit him with the profit. The customer also had the right to order a sale of property purchased, or a purchase of property sold, on his account, and was charged with the loss or credited with the profit of the transaction. Section 8 of rule 4 of the rules of the Chicago Board of Trade provided for the expulsion from that body of any member, who should knowingly execute any order for any one 'dealing in differences on the fluctuations in the market price of any commodity, without a *bona fide* purchase and sale of property for an actual delivery.' Section 2 of rule 23 of said rules is as follows: 'In case any property contracted for future delivery is not received and paid for when properly tendered, it shall be the duty of the seller, in order to establish any claim on the purchaser, to sell it on the market at any time during the next twenty-four hours, at his discretion, after such default shall have been made, notifying the purchaser within one hour of such sale; and any loss, resulting to the seller, shall be paid by the party in default.'

"Kruse and Cecil were witnesses for the prosecution. Kruse bought at defendant's Princeton office in December, 1902, one thousand bushels of wheat at about seventy cents per bushel for May delivery, and put up $30.00 as a margin, or three cents per bushel. He did not receive any wheat, but sold out at a profit through defendant before the day for delivery. Afterwards he bought another one thousand bushels of wheat at seventy-seven cents per bushel, also for May delivery, and paid $30.00 as a margin, and also sold that wheat at a profit before the day for delivery. He testified that when Flower sold him this wheat he said, 'Now your intention is to take this wheat if they deliver it to you?' and that he answered, 'Yes, sir.' He received reports of these purchases from the Chicago house of defendant on blanks like those above described. He testified he bought with the inten-

tion of taking the wheat if he stayed with it till delivery day came, but that he did not intend to do that, and take the wheat. He had had other like transactions through other parties, and always sold out before the time for delivery. At the time of the transactions with defendant he was worth about $300.00. Cecil bought five thousand bushels of oats, put up a margin of $150.00 or $200.00, received a like statement from the Chicago house, received no grain, and sold out in thirty or sixty days. He testified he was unable to say positively what his intentions were as to actually receiving the grain or selling it at a profit, but on cross-examination he said he owned a farm of over five hundred acres, and could have made use of the grain if he had had it."

HENRY S. ROBBINS, for plaintiff in error:

The secret intention of the trader is not, under the bucket-shop statute, sufficient to convict the keeper of the place. *Carroll* v. *Lessee*, 16 How. 275.

The statute prohibits only two things: The keeping of a bucket-shop, the character and methods of which are judicially established by *Christie Street Commission Co.* v. *Board of Trade*, 94 Ill. App. 229, *Board of Trade* v. *Central Stock and Grain Exchange*, 98 id. 212, and *Central Stock and Grain Exchange* v. *Board of Trade*, 196 Ill. 396; and the practice of bucket-shopping by persons who ostensibly only act as brokers or commission merchants.

Criminal intent or criminal negligence is a necessary part of every crime, (Hurd's Stat. chap. 38, sec. 280,) and a statute like the one at bar should be so construed. *Mulford* v. *Caesar*, 53 Mo. App. 263; *State* v. *Falk*, 66 Conn. 250.

It is only the pretended purchase or sale, and not the actual purchase or sale, that this statute prohibits. *Carland* v. *Telegraph Co.* 118 Mich. 369.

Legitimate transactions on the board of trade, whether for immediate or future delivery, are to be upheld. *Pearce* v. *Foote*, 113 Ill. 239.

A different construction of this statute would make it unconstitutional. Const. 1870, art. 2, sec. 1; 14th amendment to Federal constitution; *Frorer* v. *People*, 141 Ill. 171; *Braceville Coal Co.* v. *People*, 147 id. 66; *Gillespie* v. *People*, 188 id. 176.

Giving orders at Princeton, Illinois, to be forwarded to brokers in Chicago, to be there by them executed by the making of contracts for the customer upon the board of trade in Chicago, does not show a violation of this statute at Princeton. *Havens & Geddes Co.* v. *Diamond*, 93 Ill. App. 557, and cases cited; *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489.

H. J. HAMLIN, Attorney General, ORA H. PORTER, State's Attorney, and GEORGE B. GILLESPIE, Assistant Attorney General, for the People:

The keeping of an office wherein is permitted or conducted the pretended buying or selling of grain on margin, or otherwise, without any intention of receiving and paying for the property so bought or delivering the property so sold, is prohibited. Starr & Cur. Stat. 1896, chap. 38, par. 262; *Soby* v. *People*, 134 Ill. 66.

It is not necessary, in order to commit the offense, that both buyer and seller agree to do the acts therein prohibited. *Soby* v. *People*, 134 Ill. 66; Starr & Cur. Stat. 1896, chap. 38, par. 263.

The act entitled "An act to suppress bucket-shops and gambling in stocks, bonds, petroleum, cotton, grain, provisions and other produce," in force July 1, 1887, was not only aimed at bucket-shops, but was intended to prohibit all places wherein gambling in grain is permitted. *Soby* v. *People*, 134 Ill. 66.

The court should rigidly enforce the laws which have been enacted for the suppression of gambling in grain. *Cothran* v. *Ellis*, 125 Ill. 501.

The fact that the contracts were filled on the board of trade in Chicago does not necessarily make the trans-

actions *bona fide*, legitimate transactions. *Soby* v. *People*, 134 Ill. 66; *Partridge* v. *Cutler*, 168 id. 505.

Laws for the suppression of all forms of gambling have, without exception, been regarded by the courts as a proper exercise of the police power of the State. *Booth* v. *People*, 186 Ill. 43; *Booth* v. *Illinois*, 184 U. S. 425; *Soby* v. *People*, 134 Ill. 66.

Contracts for the purchase or sale of property for future delivery, with the understanding or agreement of the parties, whether that agreement is expressed on the face of the contract or exists by virtue of a secret understanding, that the property shall not be delivered or accepted but the contract is to be satisfied by an adjustment of the differences between the contract and market prices, are mere wagers or gambling contracts. *Schneider* v. *Turner*, 130 Ill. 39.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The questions of law, presented by this record, are substantially the same questions, which were decided by this court in the case of *Soby* v. *People*, 134 Ill. 66. But it is stated by the learned counsel for the plaintiff in error, that the object in presenting the present case to this court is to bring the construction of the act of 1887 again to the attention of the court "in the hope that the decision in the *Soby case* may be more accurately confined to its facts, and a further construction of the statute may be had, which, while not impairing at all its efficacy to accomplish the purposes sought in its enactment, will not work * * * unjust consequences to legitimate traders."

*First*—Section 1 of the act of 1887, referred to in the statement preceding this opinion, provides "that it shall be unlawful for any corporation * * * or person to keep or cause to be kept within this State any bucket-shop, office, store or other place, wherein is conducted

or permitted the pretended buying or selling of * * * grain, provisions or other produce, either on margins or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold; or wherein is conducted or permitted the pretended buying or selling of such property on margins; or when the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold; and the keeping of all such places is hereby prohibited." (1 Starr & Curt. Ann. Stat.—2d ed.—p. 1304).

By the fifth count in the indictment, under which the conviction, here sought to be reviewed, was secured, it is charged against the plaintiff in error that, on September 20, 1901, and on divers other dates and times between that day and the finding of this indictment, in the city of Princeton in Bureau county, it "did unlawfully keep an office wherein there was then and there permitted the pretended buying of grain on margins without any intention of receiving the grain so bought."

As explained in the statement of the facts preceding this opinion, and as set forth in paragraph 5 of the written stipulation between the parties as to the facts, plaintiff in error kept a branch office in the city of Princeton, and employed one F. E. Flower there as its agent. When a customer wished to buy grain for future delivery, he would give his order for such purchase, either in writing or orally or by telephone, to Flower, and would deposit with Flower, as the agent of plaintiff in error, a margin of not less than two cents per bushel on the grain, so desired to be bought, to secure plaintiff in error against loss by reason of the execution of the order. Flower would thereupon send an order by telegraph to plaintiff in error at Chicago, and thereupon the plaintiff in error would buy on the Chicago Board of Trade the amount of grain, so ordered to be bought by such customer. The purchase would always be made in the name of the plain-

tiff in error in accordance with the rules and regulations of the board of trade, and plaintiff in error would enter the transaction in the account kept by it with such customer. Additional margins would from time to time be required from the customer by plaintiff in error in case, by reason of the fall in the market price of the grain bought, such additional margins were necessary to protect plaintiff in error against loss by reason of the execution of the order, but otherwise additional margins would not be required. All purchases of grain, made by plaintiff in error for its customers, were reported by it to its agent in Princeton by telegraph, and he reported the transactions verbally to the customers. Plaintiff in error also reported all such purchases from its Chicago office directly to its customers upon printed blanks showing the quantity, the date, the time of delivery, the commodity purchased, the price, the name of the seller, and the name and address of the customer. At the bottom of these blanks was a notice, that the plaintiff in error reserved the right, without further notice, to close the above contracts at any time, when in its judgment funds on hand were not sufficient for marginal purposes. Paragraph 5 of the written stipulation in regard to the facts also provided as follows: "The customer also had the right at any time to order any property which had been purchased or sold on his account to be sold or purchased, in which case, if the purchase and sale or sale and purchase resulted in a loss, he would be charged with the loss, but if it resulted in a profit, he would be credited with the profit in his account with the defendant." The charge, here made against the plaintiff in error, related to the buying of grain, but the same method, under the stipulation and the rules and the evidence, would apply in case the transaction was a selling, instead of a buying, of grain.

The offense, charged against the plaintiff in error, is that of keeping an office in Princeton, wherein is per-

mitted the pretended buying of grain without any intention of receiving and paying for it. It is insisted by counsel for plaintiff in error, that the intention of the customer or purchaser to buy the grain without any intention of receiving it, but with the intention of selling it upon a rise in the market price and thereby making the difference between the contract and the market prices, may not be known or communicated to, or participated in, by the keeper of the place, and that such keeper ought not to be punished for the unlawful intention of his customer, unless he is a party to that intention, and participates in it. It is assumed, in support of this contention, that proof of the intention of the party, giving the order for the purchase or sale of the grain, is treated as being sufficient to convict the person, who keeps the place without reference to what the intention of the latter may be. Counsel refers to, and quotes the provision of the Criminal Code, which provides that "a criminal offense consists in a violation of a public law, in the commission of which there shall be a union, or joint operation, of act and intention, or criminal negligence." (Hurd's Stat. chap. 38, par. 280.) The objection, thus made by counsel, would seem to relate rather to the extent and amount of proof, required to show a participation of the keeper of the place in the intention of the customer, rather than to an absence altogether of such intention on the part of the keeper. In *Soby* v. *People, supra,* we said (p. 73): "Under this provision of the act, the keeper of such office or place, etc., cannot shield himself from criminal responsibility behind the fact that he made no inquiry of his customers. The statute is preventive in its character, and is aimed at the keeping of places where gambling in grain is permitted. The keeper must know that the transaction is not gambling, or, in good faith, have just reason to believe that the buying or selling is not within the intended prohibition of the statute." Again, in that case, it was said: "The

legislature have, as they might, rendered it unnecessary to show the intention of the keeper of the office, or place, to bring the transaction within the prohibition of the statute." The statute presumes, and the decision thus criticised presumes, that, where a man keeps a place where gambling in grain is permitted, he must necessarily intend to permit it; otherwise, he would not keep the place, where it is carried on by other parties. The testimony in this record shows no instances, where there were any legitimate transactions in grain, that is to say, purchases or sales of grain, wherein there was actual delivery of the grain. All the transactions, taking place at the office in Princeton, so far as they are shown by the proof in the record, were transactions where grain was ordered to be delivered in the future, and then sold out upon a rise in the market before the day of delivery arrived. Where such transactions are carried on in the office of a particular person, and with his aid and concurrence, a presumption of his knowledge of what is going on is made by the law, without any requirement of proof on the part of the People or prosecution.

It has been held, in reference to transactions of the kind here under consideration, that the question of intention is a question for the jury to be determined by a consideration of all the evidence. (*Pope* v. *Hanke*, 155 Ill. 617; *Jamieson* v. *Wallace*, 167 id. 388.) In their opinion, deciding this case, the Appellate Court say: "We have carefully read all this testimony from the record, and are satisfied these parties did not intend to receive the grain, or to pay anything therefor except the margins, but only to speculate on the price, and that Flower knew it." We are satisfied that this statement of the Appellate Court is correct, and that, if it is necessary to establish a participation of the plaintiff in error in the illegal intention of the customer, not only the actual transactions which occurred, but the method, in which the business was done, and the rules in pursuance of which such

business was carried on, necessarily suggest the conclusion, that there was a participation in the illegal intent on the part of plaintiff in error, or keeper of the place.

When the customer came into the office at Princeton and gave Flower an order to purchase grain, Flower telegraphed that order to plaintiff in error in Chicago. The margin, which was put up by the customer when he gave the order, was left in the hands of Flower, the agent. When plaintiff in error purchased the grain in Chicago, it purchased it in its own name. Under the rules of the board of trade itself, plaintiff in error was required to make the purchase in its own name. Under the rules, or by the mode of doing business as set forth in the agreed statement of facts, the customer had the right at any time to order the property, which had been purchased or sold on his account, to be sold or purchased. When he gave the order, that the grain purchased by him should be sold, he gave that order to Flower, or to the plaintiff in error in Chicago. Kruse testifies that he bought one thousand bushels of wheat at about seventy cents per bushel, and put up a margin of $30.00, or three cents per bushel, and that he sold out the grain, and made a profit, without waiting for the time for its delivery to arrive. His evidence also shows, that he did not intend to wait until the time of delivery, before selling the grain, if there should be a rise in the market. He also says that, when he sold it, he "sold it through the same office he bought it of;" that is to say, when there was a rise in the market, and he made up his mind to sell in order to make the difference between the contract price and the market price, he ordered the sale to be made through the plaintiff in error, or its agent at Princeton. Now, when the plaintiff in error bought the grain for Kruse upon the mere deposit of a margin, and without the payment of the whole of the purchase money, and when it, under the direction of Kruse, sold the grain before the time of delivery arrived, it certainly knew that there was a mere

speculation on the part of Kruse in differences. Flower was certainly aware of the fact that Kruse, instead of waiting until the time of delivery should arrive, was selling out before such time of delivery, because the sale was made through plaintiff in error itself or Flower its agent. Parties are always presumed to intend the natural consequences of their acts. When Kruse gave the order for the purchase of the grain, and made his deposit, and then, as soon as there was a rise in the market price, sold out the grain, the presumption is that he intended, when he first made the purchase, to sell out as soon as there was a rise. And when the plaintiff in error, or its agent, aided him in the transaction, and helped him to carry out the transaction in this illegal way, it is idle to say that the plaintiff in error did not know what the intention of Kruse was. Two purchases of grain were made by Kruse, each purchase, as we understand the evidence, being of one thousand bushels of wheat. Kruse states in his testimony that he was worth only about $300.00, and, this being so, he would not have been able in all probability to have paid for the grain, if he had waited until the time of the delivery, and the delivery of the grain had been tendered to him. "The question of intention is a question for the jury or for the court, to be determined by a consideration of all the evidence. * * * The intention of the parties in such cases may be determined from the nature of the transaction and from the manner and method of carrying on the business. * * * An examination of the authorities * * * will show that the intention of the parties may be determined from a variety of circumstances. Among these circumstances, besides the mode of dealing between the parties, is the pecuniary ability of the party purchasing. If the purchases of a party, as ordered through a broker, are larger in amount than he is able to pay for, it is a strong circumstance indicating that there was no intention of receiving the property, but rather an intention to settle

the difference between the market price and the contract price. Such intention may be also inferred where the party making the purchase never calls upon the party, ordering the purchase, for the purchase money, but only for margins. It makes no difference whether the real intention is formally expressed in words or not, if the facts and circumstances in proof show, that it was the real understanding, that there should be no actual purchase and no delivery or acceptance of the property involved in the contract, but merely an adjustment of damages upon differences." (*Jamieson* v. *Wallace, supra*).

Under the testimony in this case, it is conclusively shown that plaintiff in error kept an office in Princeton, where these illegal purchases or operations of gambling in grain were carried on. Plaintiff in error cannot relieve itself of responsibility upon the ground that it acted merely as an agent for its customers in these unlawful transactions. In *Pearce* v. *Foote*, 113 Ill. 228, we said: "There is and can be no such thing as agency in the perpetration of crimes or misdemeanors, or, indeed, in the doing of any unlawful act. All persons actively participating are principals." "If parties to speculative dealings intend merely to gamble in the rise and fall of prices, and the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is *particeps criminis*." (8 Am. & Eng. Ency. of Law,—1st ed.— pp. 1011, 1012).

If actual delivery was contemplated in all the transactions and operations carried on in this branch office at Princeton, why was it made known to the customers that they could at any time free themselves from their agreements to receive and pay for the grain when the date for delivery should arrive, by selling out before the day of such delivery upon a rise in the market? The rules, governing the purchases and sales, were such that the purchaser might at any time close out his deal, and

adjust it on the basis of the difference between the purchase price and the market price at the time of closing it out; and thus they tend to show that the grain was not purchased for actual delivery. It is to be noted also that Kruse and Cecil, who purchased grain through this office, and the other customers of the office, became responsible to no one except plaintiff in error for the purchase price. They did not deal directly with the seller of the grain, but dealt only with the plaintiff in error, or its agent in Princeton. The fact, that the printed circular, sent to customers, contained a statement to the effect that "it is distinctly understood and agreed to by you that actual delivery of property herein mentioned is contemplated," and the fact that Flower, the agent, asked Kruse, when the latter gave his order for the purchase of grain, if it was his intention to take the wheat, if they should deliver it to him, did not necessarily show that the parties contemplated an actual delivery. These preliminary precautions were unusual; and it was said in *Central Stock Exchange* v. *Board of Trade*, 196 Ill. 396: "The requiring a party, who purchased or sold, to sign a contract to accept or make delivery is an unusual circumstance, and not at all necessary in a *bona fide* transaction, the law in such case being, that the party selling is bound to deliver and the party purchasing is bound to accept delivery. Therefore, the purpose of such a contract must have been something other than the securing of a legal right." Again, in speaking of the rules of the board of trade, it was said in *Pardridge* v. *Cutler*, 168 Ill. 504: "No one can be found to deny that parties can gamble in differences under these rules as easily as to do a legitimate business, and it was wholly immaterial that the rules provided for legitimate methods."

Counsel contends that the object of the act of 1887, was merely to suppress bucket-shops and bucket-shopping. But it was held in *Soby* v. *People, supra*, that the act was intended to go further, and to suppress all places,

wherein was conducted or permitted gambling in grain or produce in any form. It makes no difference, whether the places or offices, where such gambling is conducted, are the offices of commission merchants, or members of the Board of Trade of Chicago, or not. In *Soby* v. *People, supra*, we said (p. 72): "It is a matter of common notoriety, that, notwithstanding the highly penal character of the statute of 1874, the evil it was aimed at continued to increase with wonderful rapidity throughout the State, and until in almost every city or town of any considerable importance, commission houses, offices or agencies were established, in which the great bulk of the business transacted was the making of contracts which, while legitimate upon their face, were in fact mere gambling transactions, which were never allowed to mature, but were uniformly adjusted before maturity upon differences in market price, and without any actual delivery of the articles, which were the subject matters of such pretended contracts. To remedy the mischief, the legislature, satisfied of the futility of attempting to suppress gambling in grain and other commodities by striking merely at the gambling contracts themselves, and the parties entering into such contracts, has sought, by the statute of 1887, to suppress all bucket-shops, offices, stores or other places wherein gambling in grain or other commodities is conducted or permitted. * * * It is apparent from the whole act, from the title to the concluding sentence, that the purpose and object of the legislature was to suppress the evil of gambling in produce."

We concur in the following statement, made by the Appellate Court in their opinion deciding this case: "The act of Flower in asking Kruse if he intended to take the grain, and the act of defendant in printing in each statement it issued language, purporting to bind the customer to the proposition that, in making the deal, he contemplated an actual delivery, were unusual precautions. In ordinary transactions of the purchase and sale of per-

sonal property such care would not be taken, for the law binds the seller to deliver and the purchaser to receive the property. The purpose of these precautions seems to have been to give an outward appearance of an intention to deliver and receive the property, where the actual intention was well understood by the parties to be that margins only should be advanced, and that the trades should be settled by the payment of differences without any delivery. * * * It is obvious Kruse had no use for one thousand bushels of wheat, nor the means to pay for it. Cecil states no facts to give reasonable color to his testimony, that he could use five thousand bushels of oats on his farm. . Both Kruse and Cecil had traded in this manner before with other houses."

*Second*—It is claimed, on the part of the plaintiff in error, that the crime, if any, was committed in Chicago instead of Princeton. We do not think that this contention can be maintained. The only contract or agreement, which either of the witnesses in this case made, was so made in the office of the plaintiff in error in Princeton. The market quotations were there posted upon the blackboard, and were there made known to the customers. The orders for the purchase or sale of grain were given in the office at Princeton. All margins that were put up were paid in the office at Princeton. The agent of the plaintiff in error at Princeton, and the customer, met each other in the office at that place. No grain was ever purchased by either Kruse or Cecil on the board of trade in their names. The only difference between the case of *Soby.* v. *People, supra,* and the case at bar is, that, in the former case, the agent of the firm, which was doing the business on the board of trade, was indicted, while, in the case at bar, the principal was indicted. Although the deal was carried out on the Chicago Board of Trade, as was done here, yet in the *Soby case* the conviction was sustained in the county where the orders were given, where the margins were paid, and where the office was kept.

*Third*—The point, made by the counsel for plaintiff in error, that this law is unconstitutional, as being in contravention of the fourteenth amendment of the constitution of the United States, is fully answered by the cases of *Booth* v. *People,* 186 Ill. 43, and *Booth* v. *Illinois,* 184 U. S. 425. In *Booth* v. *People, supra,* this court held that laws for the suppression of all forms of gambling have, without exception, been regarded by the courts and law writers as a proper exercise of the police power of the State. The doctrine of *Booth* v. *People, supra,* was approved of by the Supreme Court of the United States in *Booth* v. *Illinois, supra.* In the latter case, it was held that the legislature of Illinois did not transcend the limits of constitutional authority when it enacted the statute against options, known as section 130 of the Criminal Code of Illinois, and it was there said: "We cannot say from any facts judicially known to the court, or from the evidence in this case, that the prohibition of options to sell grain at a future time has, in itself, no reasonable relation to the suppression of gambling grain contracts in respect of which the parties contemplate only a settlement on the basis of differences in the contract and market prices. * * * It must be assumed that the legislature was of opinion that an effectual mode to suppress gambling grain contracts was to declare illegal all options to sell or buy at a future time. The court is unable to say that the means employed were not appropriate to the end sought to be attained, and which it was competent for the State to accomplish." We see no reason why the same reasons for holding the act in regard to options constitutional do not apply to the act of 1887, under which the present conviction was had.

We are of the opinion that there was no error in the judgment of the lower courts. Accordingly, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*